No. 26-4872

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

S.D. and J.F., individually and on behalf of all others similarly situated,

Plaintiffs-Appellees,

v.

MIKE REESE, et al.,

Defendants-Appellants,

JOHN DOES, 1-5,

Defendants.

# APPELLANTS' OPENING BRIEF

Appeal from the United States District Court
for the District of Oregon

DAN RAYFIELD #064790
Attorney General
PAUL L. SMITH #001870
Solicitor General
ROBERT A. KOCH #072004
Attorney-in-Charge,
Civil & Administrative Appeals
ARIEL T. ASHTAMKER #260068
Assistant Attorney General
1162 Court St. NE
Salem, Oregon 97301-4096
Telephone: (503) 378-4402
ariel.ashtamker@doj.oregon.gov
Attorneys for Appellants

## TABLE OF CONTENTS

INTRODUCTION .......... 1

STATEMENT OF JURISDICTION .......... 3

STATEMENT OF THE ISSUES .......... 3

STATEMENT OF PERTINENT AUTHORITIES .......... 4

STATEMENT OF THE CASE .......... 4

I. Plaintiffs sought a preliminary injunction and provisional class certification based primarily on placement statistics. .......... 5

II. The district court granted a mandatory preliminary injunction and provisional class certification based on plaintiffs' statistical arguments. .......... 7

III. The district court began implementing its orders by requiring defendants to disclose unredacted information about all transgender AICs. .......... 8

SUMMARY OF ARGUMENT .......... 9

STANDARD OF REVIEW .......... 11

ARGUMENT .......... 12

I. The district court abused its discretion by issuing a mandatory preliminary injunction. .......... 12

A. The district court clearly erred when it found that ODOC routinely ignores its formal policies and instead applies a "default presumption" of housing transgender women AICs in men's prisons. .......... 13

B. The district court improperly placed the burden of proof on defendants. .......... 22

C. The district court's analysis of each *Winter* factor fails because the court premised that analysis on its clearly erroneous factual finding and application of an erroneous legal standard. .......... 23

D. The terms of the district court's mandatory preliminary injunction are vague and overbroad and thus conflict with the PLRA. .......... 25

II. The district court abused its discretion by provisionally certifying the class.......... 31

CONCLUSION.......... 34

ADDENDUM

**TABLE OF AUTHORITIES**

**Cases Cited**

*A&M Recs., Inc. v. Napster, Inc.*,
284 F.3d 1091 (9th Cir. 2002).......... 25

*Alabama-Tombigbee Rivers Coal. v. Kempthorne*,
477 F.3d 1250 (11th Cir. 2007).......... 21

*Arc of Cal. v. Douglas*,
757 F.3d 975 (9th Cir. 2014).......... 13, 23, 24

*Armstrong v. Brown*,
768 F.3d 975 (9th Cir. 2014).......... 30, 31

*Associated Press v. Otter*,
682 F.3d 821 (9th Cir. 2012).......... 11

*Bell v. Wolfish*,
441 U.S. 520 (1979) .......... 30, 31

*BNSF Ry. Co. v. County of Alameda*,
7 F.4th 874 (9th Cir. 2021).......... 11

*Columbia Pictures Indus., Inc. v. Fung*,
710 F.3d 1020 (9th Cir. 2013).......... 25

*Dickinson v. Trump*,
174 F.4th 634 (9th Cir. 2026).......... 28

*Fraihat v. U.S. Immigr. & Customs Enf't*,
16 F.4th 613 (9th Cir. 2021).......... 3, 31

*Garcia v. Google, Inc.*,
786 F.3d 733 (9th Cir. 2015).......... 12, 14, 22

*Gates v. Cook*,
376 F.3d 323 (5th Cir. 2004)....................................................................30

*Gilbrook v. City of Westminster*,
177 F.3d 839 (9th Cir. 1999),
*as amended on denial of reh'g* (July 15, 1999)........................................19

*L.A. Press Club v. Noem*,
171 F.4th 1179 (9th Cir. 2026)..................................................................11

*Melendres v. Arpaio*,
695 F.3d 990 (9th Cir. 2012)................................................................3, 25

*NetChoice, LLC v. Bonta*,
170 F.4th 744 (9th Cir. 2026)....................................................................22

*Norbert v. City & County of San Francisco*,
10 F.4th 918 (9th Cir. 2021)......................................................................24

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
31 F.4th 651 (9th Cir. 2022)......................................................................11

*Paige v. California*,
102 F.3d 1035 (9th Cir. 1996)......................................................................3

*Porretti v. Dzurenda*,
11 F.4th 1037 (9th Cir. 2021)....................................................................30

*Rhodes v. Chapman*,
452 U.S. 337 (1981) ...................................................................................30

*Sali v. Corona Reg'l Med. Ctr.*,
909 F.3d 996 (9th Cir. 2018)............................................................. 32, 33

*San Luis Obispo Coastkeeper v. County of San Luis Obispo*,
161 F.4th 590 (9th Cir. 2025)............................................................ 12, 13

*Shields v. United of Omaha Life Ins. Co.*,
50 F.4th 236 (1st Cir. 2022) .......................................................................21

*Siewe v. Gonzales*,
480 F.3d 160 (2d Cir. 2007) .......................................................................19

*Simon v. City & County of San Francisco*,
135 F.4th 784 (9th Cir. 2025)....................................................................28

*Starbucks Corp. v. McKinney*,
602 U.S. 339 (2024) ...................................................................................12

*Thakur v. Trump*,
176 F.4th 1187 (9th Cir. 2026) .......... 11

*Tourgeman v. Nelson & Kennard*,
900 F.3d 1105 (9th Cir. 2018) .......... 23

*Turner v. Safley*,
482 U.S. 78 (1987) .......... 29

*United States v. Barnes*,
895 F.3d 1194 (9th Cir. 2018) .......... 21

*Valentine v. Collier*,
956 F.3d 797 (5th Cir. 2020) .......... 30

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) .......... 32, 33

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .......... 12, 13, 22, 23, 24, 25

*Woodford v. Ngo*,
548 U.S. 81 (2006) .......... 29

## Constitutional and Statutory Provisions

18 U.S.C. § 3626(a)(2) .......... 30

28 U.S.C. § 1292(a)(1) .......... 3

28 U.S.C. § 1331 .......... 3

42 U.S.C. § 1983 .......... 3

U.S. Const., Amend. VIII .......... 2, 4, 7, 9, 14, 23, 30

U.S. Const., Amend. XIV .......... 4, 14

## Other Authorities

Fed. R. App. P. 4(a)(1)(A) .......... 3

Fed. R. Civ. P. 23 .......... 10, 31, 32

Fed. R. Civ. P. 23(a) .......... 32

Fed. R. Civ. P. 65(d) .......... 25

Michael J. Saks,
*Trial Outcomes and Demographics: Easy Assumptions Versus Hard Evidence*,
80 TEX. L. REV. 1877 (2002)....................................................................20

ODOC Policy 40.1.13..........................................................................15

## APPELLANTS' OPENING BRIEF

## INTRODUCTION

The Oregon Department of Corrections ("ODOC") determines housing placements for transgender Adults-in-Custody ("AICs") through individualized assessments. Under ODOC's policies, those assessments consider several factors, including each AIC's health, gender identity, history, and safety, while also balancing institutional security and the safety of other AICs.

Despite the plain text of ODOC's policies and defendants' evidence demonstrating that ODOC conducts those individualized assessments, plaintiffs nevertheless allege that ODOC ignores those policies, instead classifying and housing transgender women solely based on their genitalia, and without genuine consideration of their gender identity or safety. And in moving for mandatory injunctive relief, plaintiffs asserted that ODOC has a default presumption of housing transgender women in men's prisons solely because ODOC's individualized assessments result in most transgender women AICs being housed in men's prisons. Notably, plaintiffs neither offered nor pointed to any evidence that ODOC implements a presumption so plainly contrary to its formal policies.

The district court accepted plaintiffs' illogical assertion and found that ODOC has a default presumption of housing transgender women AICs in men's

facilities. The court so found, despite ample evidence in the record showing that ODOC has no such presumption and zero evidence to the contrary, based solely on the statistical total number of transgender women currently housed in men's facilities across the state. With only the thread of that clearly erroneous factual finding, the court issued a mandatory preliminary injunction under the Eighth Amendment that micromanages the state's administration of its prison system for transgender women AICs under terms both vague and overbroad. The court also provisionally certified a class of all transgender women in ODOC custody and then ordered the disclosure of their personal information otherwise protected by Oregon law—including their names and gender identities—without their consent to the individual named plaintiffs' counsel.

That extraordinary injunction and the provisional class certification issued in its service should be vacated. The injunction was premised on a clearly erroneous factual finding that lacked any basis in the record. And the injunction's unworkable terms, which micromanage prison administration, offend principles of comity and fail to reflect the deference that federal courts owe to states under the Prison Litigation Reform Act ("PLRA"). Defendants-Appellants—Mike Reese, Ryan LeGore, Jeremy Wagner, Mark Nooth, Erin Reyes, and the State of Oregon—thus respectfully request that this Court vacate

the district court's mandatory preliminary injunction and provisional class certification.

## STATEMENT OF JURISDICTION

The district court had federal-question jurisdiction under 28 U.S.C. § 1331 over this action filed under 42 U.S.C. § 1983. The district court granted plaintiffs' motion for a preliminary injunction on April 28, 2026; granted in part and denied in part defendants' motion for reconsideration on July 7, 2026; and entered an amended order on preliminary injunction on July 7, 2026. 1-ER-2–53. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).[1] Defendants filed a timely notice of appeal on July 29, 2026. 3-ER-406–60; *see also* Fed. R. App. P. 4(a)(1)(A).

## STATEMENT OF THE ISSUES

1. Whether the district court abused its discretion by issuing a mandatory preliminary injunction (1) based on a finding that defendants have a default presumption for housing transgender women AICs in men's prisons, despite no evidence in the record to support that finding and ample evidence to

---

[1] This Court has jurisdiction to review the district court's provisional class certification order. *Fraihat v. U.S. Immigr. & Customs Enf't*, 16 F.4th 613, 635 (9th Cir. 2021); *see also Melendres v. Arpaio*, 695 F.3d 990, 999 (9th Cir. 2012) ("[W]here an injunction provides class-wide relief, 'effective review of the injunction requires review of the class certification.'" (quoting *Paige v. California*, 102 F.3d 1035, 1039 (9th Cir. 1996))).

the contrary; (2) relying on assumptions about evidence that effectively and improperly shifted the burden of proof to defendants; and (3) imposing unworkable terms so vague and overbroad that they conflict with the PLRA.

2. Whether the district court abused its discretion by provisionally certifying a class in service of its defective injunction.

## STATEMENT OF PERTINENT AUTHORITIES

Pertinent rules are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

Plaintiffs J.F. and S.D. filed a class action complaint against defendants alleging violations of the Eighth Amendment, the Fourteenth Amendment, and the Oregon Constitution. *See* 3-ER-397–402. Plaintiffs centrally alleged that ODOC "routinely classifies and houses transgender women solely on the basis of their genitalia, without genuine consideration of gender identity or safety." 3-ER-370–71. Then, as explained further below, they sought a mandatory preliminary injunction and provisional class certification based primarily on placement statistics, and the district court relied on those statistics to grant that relief. And the district court began implementing its orders by requiring defendants to produce unredacted information about all transgender AICs.

## I. Plaintiffs sought a preliminary injunction and provisional class certification based primarily on placement statistics.

Plaintiffs moved for preliminary injunctive relief, submitting declarations from Plaintiff J.F. and three anonymous transgender women AICs in support of the motion. *See* 3-ER-309–68; 2-ER-287–307.[2] Plaintiffs acknowledged that ODOC's existing policies establish individualized assessments for housing transgender AICs but argued that "ODOC's actual practice is to house transgender women by birth sex or genitalia." 3-ER-319. Plaintiffs also requested that the district court provisionally certify a class of "all current and future transgender women in ODOC custody." 3-ER-362.

Defendants opposed the motion and submitted evidence showing that, consistent with its policies, ODOC conducts individualized assessments to determine housing for transgender women AICs on a case-by-case basis. 2-ER-244–86, 229–43, 145–51. That evidence also showed that ODOC does not determine housing placements by genitalia and, instead, considers a variety of factors—including a transgender AIC's gender identity and own views about their safety—when deciding housing placements. 2-ER-229–43. Out of concern and respect for the privacy of each individual AIC, defendants

---

[2] Plaintiff S.D., who is no longer in ODOC custody, did not submit a declaration. *See* 1-ER-24 n.1.

endeavored not to disclose individualized evidence and information that might reveal the identity of transgender women AICs who had not made themselves a party to the litigation. And plaintiffs offered no evidence that contradicted defendants' evidence showing that ODOC has no default housing presumption for transgender women AICs—neither in formal policy nor in practice.

Nonetheless, plaintiffs' counsel continued to assert that ODOC "place[s] transgender women presumptively in general population in men's prisons," as demonstrated, in their view, because the "outcome" of ODOC's individualized assessments is that "some 90 percent or greater than 90 percent of the transgender inmates are housed in men's prisons and are by default initially housed there." 2-ER-155–56. Plaintiffs' counsel further reasoned: "And I think the state obviously knows that . . . if plaintiffs were to prevail on reversing the presumption to requiring housing consistent with gender identity, then a vastly larger number of them would be housed at [the state's women's prison]." 2-ER-186. According to plaintiffs' counsel, "the notion that this is just, you know, gender blind, we have no idea what their genitalia are or whether they are trans or they were born with it or not, cannot possibly -- it doesn't pass the smell test and cannot possibly be true." 2-ER-187–88. Notably, plaintiffs pointed to no evidence in support of their claim that ODOC ignores its formal

policies and instead applies a default housing presumption for transgender women AICs.

## II. The district court granted a mandatory preliminary injunction and provisional class certification based on plaintiffs' statistical arguments.

On April 28, 2026, the district court provisionally certified a class and issued a mandatory preliminary injunction based on plaintiffs' Eighth Amendment claim. 1-ER-16–53. Based solely on the aggregate number of transgender women AICs in men's prisons, the court found that ODOC applies a "default presumption" for housing transgender women AICs in men's prisons—essentially, that ODOC routinely ignores its formal policies. 1-ER-35–37; *see also, e.g.*, 1-ER-17–18 ("Thus, regardless of the individualized assessments that ODOC purports to conduct, more than 90% of transgender women are housed in men's facilities. It is undisputed in the record before the Court that this default presumption, and their overwhelming placement in men's prisons, has exposed transgender women inmates to a high risk of violence and sexual assault."). The court therefore ordered defendants, among other things, to "[i]mmediately end the categorical housing of transgender women in men's facilities without individualized safety assessments" and instead conduct individualized assessments "with a presumption of placement consistent with

each woman's gender identity absent a documented and articulable security justification." 1-ER-43–44.

Defendants moved for reconsideration, 2-ER-110–39, and to stay discovery pending resolution of the motion for reconsideration, 2-ER-105–09. The district court denied the stay motion. 3-ER-469.

On July 7, 2026, the court granted in part and denied in part defendants' motion for reconsideration. 1-ER-2–15. The court reiterated its central finding that "ODOC has a policy of presumptive placement in men's facilities" based on the total number of transgender women AICs housed in men's prisons. 1-ER-11. The court modified the terms of its mandatory injunction to clarify that: (1) the presumption of placement consistent with each AIC's gender identity "applies as a starting point," and (2) an AIC's preferences "may be taken into consideration" for any of the preliminary injunction's terms. 1-ER-14. The court then issued an otherwise identical mandatory preliminary injunction that superseded the prior relief. 1-ER-3–4.

## III. The district court began implementing its orders by requiring defendants to disclose unredacted information about all transgender AICs.

On July 23, 2026, the court held a status conference to discuss its orders, during which defendants requested a stay pending appeal of both the mandatory preliminary injunction and further district court proceedings, which the court

denied. 3-ER-470. Separately during the hearing, when plaintiffs inquired about discovery on the names of all transgender AICs in the state (which defendants opposed), the court construed that inquiry as an oral motion to compel; the next day, without briefing or a written opinion, the court ordered defendants to produce "discovery that personally identifies the transgender inmates in ODOC custody, which has so far been withheld or redacted by Defendants." *Id.*

Defendants filed a timely notice of appeal on July 29, 2026, 3-ER-406–60, and an emergency motion for stay pending appeal on July 31, 2026, Dkt. No. 3–4. On August 1, 2026, this Court granted a temporary administrative stay pending resolution of the emergency stay motion and set an expedited briefing schedule for the motion and this appeal. Order, Dkt. No. 5.

## SUMMARY OF ARGUMENT

The district court abused its discretion by issuing a mandatory preliminary injunction on plaintiffs' Eighth Amendment claim and provisionally certifying the class in service of that injunction.

First, the court clearly erred by finding that ODOC routinely ignores its formal policies and instead applies a default presumption for housing transgender women AICs in men's prisons, because there was no evidence to support that finding and ample evidence to the contrary. Both the preliminary-

injunction order and the class-certification order rested on that clearly erroneous factual finding.

Second, the court applied an erroneous legal standard when it relied on assumptions about evidence that defendants did not present, instead of requiring plaintiffs to rebut defendants' evidence showing that ODOC has no default housing presumption for transgender women AICs, certainly not in formal policy and also not in practice. Plaintiffs—not defendants—bore the burden of proving each element required for a mandatory preliminary injunction and class certification.

Third, the court abused its discretion in crafting the injunction's scope, as the injunction's terms conflict with the PLRA because they are so vague and overbroad that they are unworkable. A federal court's preliminary injunction may not micromanage a state's administration of its prison system under the PLRA.

Finally, the court abused its discretion in provisionally certifying the class because it was in service of its defective injunction. And, at any rate, plaintiffs failed to carry their burden of affirmatively demonstrating through evidentiary proof that the proposed class meets the requirements of Federal Rule of Civil Procedure 23.

## STANDARD OF REVIEW

This Court "review[s] for abuse of discretion a district court's decision regarding preliminary injunctive relief." *BNSF Ry. Co. v. County of Alameda*, 7 F.4th 874, 878–79 (9th Cir. 2021). In so doing, the Court "review[s] findings of fact for clear error and conclusions of law de novo." *Id.* at 879. The Court reviews de novo whether a district court applied the correct legal standard. *Associated Press v. Otter*, 682 F.3d 821, 824 (9th Cir. 2012). As with the decision on preliminary injunctive relief, this Court "review[s] the scope of a preliminary injunction for abuse of discretion." *Thakur v. Trump*, 176 F.4th 1187, 1206 (9th Cir. 2026) (per curiam) (quoting *L.A. Press Club v. Noem*, 171 F.4th 1179, 1190 (9th Cir. 2026)).

This Court reviews a district court's decision to certify a class for abuse of discretion. *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 663 (9th Cir. 2022) (en banc). In so doing, the Court reviews "the district court's determination of underlying legal questions de novo . . . and its determination of underlying factual questions for clear error." *Id.* (citation omitted).

## ARGUMENT

### I. The district court abused its discretion by issuing a mandatory preliminary injunction.

"A preliminary injunction is an 'extraordinary' equitable remedy that is 'never awarded as of right.'" *Starbucks Corp. v. McKinney*, 602 U.S. 339, 345–46 (2024) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)). To obtain a preliminary injunction, a plaintiff "must make a clear showing" that she is likely to succeed on the merits, that she is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in her favor, and that an injunction is in the public interest. *Id.* at 346 (quoting *Winter*, 555 U.S. at 20). A plaintiff's "burden . . . is doubly demanding" where she seeks a mandatory preliminary injunction, as "she must establish that the law and facts *clearly favor* her position, not simply that she is likely to succeed." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc); *see also San Luis Obispo Coastkeeper v. County of San Luis Obispo*, 161 F.4th 590, 603 (9th Cir. 2025) (VanDyke, J., concurring) ("In general, district courts should hesitate before granting requests for mandatory preliminary injunctions.").

Here, the district court issued a mandatory preliminary injunction that provides class-wide relief based on its finding that ODOC routinely ignores its formal policies and instead applies a "default presumption" of housing

transgender women AICs in men's prisons. The district court abused its discretion for four reasons: (1) its "default presumption" finding is clearly erroneous because it lacks any basis in the record; (2) the court committed legal error by placing the burden of proof on defendants; (3) the court's analysis of each *Winter* factor fails because it rested on the court's clearly erroneous factual finding and its application of an erroneous legal standard; and (4) the injunction's terms conflict with the PLRA because they are vague and overbroad.

### A. The district court clearly erred when it found that ODOC routinely ignores its formal policies and instead applies a "default presumption" of housing transgender women AICs in men's prisons.

A factual finding is clearly erroneous when "the record contains no evidence to support it," *San Luis Obispo Coastkeeper*, 161 F.4th at 597, and when "it is illogical, implausible, or without support in inferences that may be drawn from the facts in the record," *Arc of Cal. v. Douglas*, 757 F.3d 975, 983–84 (9th Cir. 2014) (quotation marks omitted).

In moving for a preliminary injunction, plaintiffs asserted—without citation to any relevant evidence—that "ODOC's actual practice is to house transgender women by birth sex or genitalia, almost invariably in men's prisons." 3-ER-319; *see also, e.g.*, 3-ER-363. The district court found that ODOC, in a routine derogation from its formal policies, has a "default

presumption" of housing transgender women AICs in men's prisons and, based on that finding, concluded that the law and facts clearly favor plaintiffs' position as to their Eighth Amendment claim. *See, e.g.*, 1-ER-35 (finding that "the current default housing for transgender women AICs is placement in men's facilities"); 1-ER-17–18 ("It is undisputed in the record before the Court that this default presumption, and their overwhelming placement in men's prisons, has exposed transgender women inmates to a high risk of violence and sexual assault.").[3]

The district court's foundational finding was clearly erroneous because the record contained no evidence to support it. Rather, the record reflects that ODOC conducts individualized assessments to determine a transgender AIC's housing placement on a case-by-case basis. ODOC's policies—which plaintiffs quoted in their complaint—make clear that ODOC "shall provide housing assignments that reduce the likelihood of sexual abuse and sexual harassment."

---

[3] The district court's mandatory preliminary injunction rests solely on its Eighth Amendment analysis. Although the district court's initial opinion and order also discussed plaintiffs' Fourteenth Amendment claim, the court acknowledged on reconsideration that it had not examined that claim under the requisite legal standard for a mandatory preliminary injunction—namely, whether the law and facts "*clearly favor*" plaintiffs' position. *Garcia*, 786 F.3d at 740; *see also* 1-ER-12; 1-ER-36–39.

3-ER-382 & n.9; Add-6.[4] To that end, new AICs are assessed within 72 hours of arrival in ODOC custody and again within 30 days to determine whether they meet specific criteria indicating vulnerability, one of which is whether the AIC "is or is perceived to be . . . transgender, intersex, or gender nonconforming[.]" Add-6. Then, when deciding housing placements for transgender AICs—most of whom first identify as transgender after entering ODOC custody—ODOC "consider[s] on a case-by-case basis whether a placement would ensure the AIC's health and safety, and whether the placement would present management or security problems." Add-7; *see also* 2-ER-145–48. Importantly, a transgender AIC's "own views with respect to their own safety shall be given serious consideration" during this process. Add-7. ODOC reviews housing placements for transgender AICs at least twice per year. *Id.*

In addition, in compliance with the Prison Rape Elimination Act ("PREA"), ODOC's policies and procedures seek to address and eliminate the risk of sexual abuse and harassment for all AICs. ODOC will designate an AIC as aggressive, and therefore likely to perpetrate sexual abuse, "if there are indications that they may be a sexually abusive AIC, or are prone to victimize other AICs, especially in regard to sexual behavior." Add-6. ODOC's initial

---

[4] Plaintiffs' complaint included a link to ODOC Policy 40.1.13, *see* 3-ER-382 n.9, a copy of which is included in the addendum to this brief.

screening considers an AIC's "prior acts of sexual abuse, prior convictions for violent offenses, and history of prior institutional violence or sexual abuse." *Id.* ODOC then uses that information to determine housing placements "with the goal of keeping separate those AICs at high risk of being sexually victimized from those at high risk of being sexually abusive." Add-7.

Defendants presented evidence that ODOC regularly conducts those individualized assessments. 2-ER-238–42. New admits to ODOC who identify themselves as transgender, nonbinary, genderfluid, or intersex are "placed in the infirmary until the Committee can gather all necessary information to decide placement," and current AICs who so identify "remain in their current facility until [ODOC's Transgender and Intersex Committee (TAIC)] reviews and makes a placement determination." 2-ER-240.[5] And contrary to plaintiffs' central argument, the evidence explicitly showed that "ODOC does not house by genital status; case-by-case determinations are made utilizing an objective screening process." *Id.* Indeed, of the eight transgender women AICs housed at the state's women's prison, half have had no bottom gender-affirming surgery; one is unconfirmed; and three have had bottom gender-affirming surgery. 2-ER-230.

---

[5] TAIC is an interdisciplinary team dedicated to the care of transgender, intersex, and nonbinary AICs. 2-ER-238–42.

The record also contained evidence that ODOC has conducted individualized assessments for Plaintiff J.F. and the three declarants who submitted declarations in support of the request for injunctive relief. 2-ER-240–42. ODOC cited specific safety concerns and the AICs' own preferences in denying most of their requests to transfer to the state's women's prison, Coffee Creek Correctional Facility ("CCCF"). *Id.*

Plaintiff J.F., for instance, was deemed ineligible for transfer to CCCF due to safety concerns, as she is incarcerated for committing a sex offense against a non-verbal, disabled victim with physical limitations, having inserted an 11-inch plastic object into the victim's vagina, which lodged in the victim's abdomen and caused injuries that could have been fatal. 2-ER-240–41. As to the three declarants, ODOC cited safety and security concerns and the declarants' own preferences when denying their requests. *See, e.g.*, 2-ER-241 (noting that Jane Doe acted aggressively toward others while housed at CCCF and that she requested to return to a men's facility); *id.* (denying L.B.'s transfer requests because she had sexually abused a young child family member and had physically assaulted a girlfriend by grabbing her throat and pushing her up against a wall); 2-ER-242 (noting that S.S. requested to be housed in men's facilities for over six years after identifying as transgender and did not request a transfer to CCCF until two months before her release). ODOC also noted that

Jane Doe returned to CCCF for her vulvoplasty and recovery and has since remained housed there. 2-ER-241.

In other words, the evidence in the record demonstrated that ODOC follows its formal policies that require determining housing placements for transgender AICs on a case-by-case basis through individualized assessments—and not through a blanket policy or default presumption of placement in men's prisons. And, importantly, plaintiffs offered no evidence indicating that ODOC has such a presumption.

Despite the evidence in the record, the district court found that ODOC ignores those policies and instead applies a "default presumption" of housing transgender women AICs in men's prisons. In doing so, the court focused on statistics: that ODOC houses 117 transgender women AICs in its prisons, that 26 of those 117 women requested to be housed at CCCF, and that eight of those 26 women are currently housed at CCCF. *See* 2-ER-240. The court found that, because "109 out of 117 transgender women are housed in a men's prison facility[,] . . . [t]he numbers overwhelmingly show that the current default presumption is that transgender women are housed in men's prisons, except in rare cases." 1-ER-37. The court relied solely on that number to infer that ODOC has a default presumption. *See* 1-ER-34 ("[T]he data submitted by Defendants speaks for itself."). In other words, in finding that ODOC routinely

derogates from or ignores its policy requiring a case-by-case analysis, the district court looked only to an aggregate number.

That finding is clearly erroneous. Although the record contained ample evidence of ODOC's individualized assessments for housing transgender women AICs, and plaintiffs offered no evidence to the contrary, the district court inferred that those assessments must not be individualized—and that there is therefore a default presumption—because they result in most transgender women AICs being housed in men's prisons. For that inference to be valid, the court needed an evidentiary basis for why individualized determinations are unlikely to result in that outcome. But the court never identified such a basis. And in the absence of any evidence to support its inference, the court's factual finding is illogical and amounts to mere speculation. *See, e.g.*, *Gilbrook v. City of Westminster*, 177 F.3d 839, 871 (9th Cir. 1999), *as amended on denial of reh'g* (July 15, 1999) (noting that "an inference from lack of evidence would amount to no more than speculation"); *Siewe v. Gonzales*, 480 F.3d 160, 168 (2d Cir. 2007) ("An inference is not a suspicion or a guess. It is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact that is known to exist." (simplified)); *cf.* Michael J. Saks, *Trial Outcomes and Demographics: Easy Assumptions Versus Hard Evidence*, 80 TEX. L. REV. 1877, 1883 (2002) (describing the ecological fallacy as "the error of thinking

that relationships (or non-relationships) found at one level of aggregation will also be true at a different level").

The outcome of ODOC's individualized-assessment process does not disprove the existence of that process. At bottom, the district court's finding amounts to nothing more than an application of the "smell test" that plaintiffs offered. *See* 2-ER-186–87 (plaintiffs' argument that ODOC's implementation of its formal policies "doesn't pass the smell test and cannot possibly be true"). But plaintiffs' "smell test" is not an appropriate basis for judicial factfinding.

The district court compounded its error on reconsideration. The court noted evidence in the record that one of the declarants "affirmatively requested to be housed at predominately male institutions." 1-ER-11. But the court declined to reconsider its finding that ODOC has a default housing presumption, reasoning that "[i]f Defendants had similar evidence that the 91 AICs at issue here made affirmative requests to be housed in men's facilities, the Court *assumes* they would have offered that evidence." *Id.* (emphasis added). That is, on reconsideration, the court inferred that those transgender women AICs must not have made affirmative requests because defendants did not provide specific evidence as to each AIC. That burden of proof was not defendants' to bear. And the court's inference—based on a mere assumption—is both illogical and unsupported by the record. *See United States v. Barnes*,

895 F.3d 1194, 1199 (9th Cir. 2018) (explaining that a court cannot "substitute [its] assumptions for evidence in the record"); *cf. Alabama-Tombigbee Rivers Coal. v. Kempthorne*, 477 F.3d 1250, 1257 (11th Cir. 2007) (describing the negative proof fallacy as "the mistake that is committed whenever it is argued that a proposition is true simply on the basis that it has not been proved false, or that it is false because it has not been proved true").

The district court also unreasonably stacked inferences on reconsideration to reach another unsupported rationale for ignoring plaintiffs' failure to make an affirmative showing that ODOC has a default housing presumption. It inferred that because Plaintiff J.F. "had conversations with staff about wanting a transfer to CCCF in 2019" but "did not request a transfer to CCCF until August of 2021," she therefore "did not know that she had to make a formal housing transfer request" during that time. 1-ER-11–12. And based on that intermediate inference, it "further infer[red] that other AICs could be similarly unaware of the process to formally request a housing transfer." 1-ER-12. That ultimate inference is unreasonable, unsupported by the record, and amounts to an impermissible "pyramid of inferences." *Shields v. United of Omaha Life Ins. Co.*, 50 F.4th 236, 245 (1st Cir. 2022) (citation omitted).

To be clear, this is not a case in which plaintiffs offered sufficient proof to carry their burden and the district court discounted or discredited contrary

evidence from defendants; rather, this is a case in which the record contains no affirmative evidence to support plaintiffs' assertion that ODOC has a default housing presumption.

### B. The district court improperly placed the burden of proof on defendants.

It is well established that "[t]he party seeking a preliminary injunction bears the burden of proving each element." *NetChoice, LLC v. Bonta*, 170 F.4th 744, 753 (9th Cir. 2026). That is because injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22. And a plaintiff's burden is "doubly demanding" where, as here, she seeks a mandatory preliminary injunction, as "she must establish that the law and facts *clearly favor* her position, not simply that she is likely to succeed." *Garcia*, 786 F.3d at 740.

Accordingly, plaintiffs—not defendants—bore the burden of establishing that the law and facts clearly favor their position. But plaintiffs offered no evidence that ODOC has a default presumption for housing transgender women in men's prisons. Instead, as discussed, the district court based its central finding on an assumption about evidence that defendants did not present. That was legal error. *See Tourgeman v. Nelson & Kennard*, 900 F.3d 1105, 1108

(9th Cir. 2018) ("Whether the district court properly allocated the burden of proof is a conclusion of law reviewed de novo.").

### C. The district court's analysis of each *Winter* factor fails because the court premised that analysis on its clearly erroneous factual finding and application of an erroneous legal standard.

A district court abuses its discretion when it premises its analysis of the *Winter* factors on a clearly erroneous factual finding or an erroneous legal standard. *See Arc of Cal.*, 757 F.3d at 984–92. Here, the district court committed both errors.

First, in its analysis of each *Winter* factor, the district court relied on its clearly erroneous finding that ODOC has a default presumption for housing transgender women AICs in men's prisons. *See, e.g.*, 1-ER-35–36 (concluding that the law and facts favor plaintiffs on their Eighth Amendment claim because "[t]ransgender AICs are . . . overwhelmingly housed in men's facilities, and their reports of violence are ignored or insufficiently investigated"); 1-ER-39 (concluding that plaintiffs have shown irreparable harm because "they suffer ongoing threats of violence and sexual assault, from their cellmates and from AICs in the general population at men's prison facilities, which have gone unheeded and unprevented by Defendants"); 1-ER-39–40 (citing the "default presumption of housing [transgender women AICs] in a men's prison" and

concluding that the balance of equities and public interest tip in plaintiffs' favor).

Second, the court committed legal error by improperly placing the burden of proof on defendants throughout its analysis of the *Winter* factors. *See, e.g.*, 1-ER-34 ("ODOC's explanations are not responsive to the allegation that a major cause of both the known higher risk of violence and the violence itself, was due to the default housing placement of transgender women in men's prison facilities."); 1-ER-35 ("The fact that only 26 out of 117 requested a transfer is given little weight because the Court has no information about the other 91 AICs, including whether they are aware that requesting a transfer is required, or that it is even an option, to be considered for housing at CCCF."); *see also* 1-ER-11 ("If Defendants had similar evidence that the 91 AICs at issue here made affirmative requests to be housed in men's facilities, the Court assumes they would have offered that evidence.").

Because those errors "infect" the district court's analysis of each *Winter* factor, *Arc of Cal.*, 757 F.3d at 992, that entire analysis fails, and the court abused its discretion in issuing a mandatory preliminary injunction. *Cf. Norbert v. City & County of San Francisco*, 10 F.4th 918, 936 (9th Cir. 2021) (affirming district court's denial of preliminary injunction on a theory for which plaintiffs offered insufficient evidence and not reaching remaining arguments "because

the district court's factual findings on the lack of any demonstrated causal harm provide a sufficient basis for concluding that plaintiffs on this record failed to" carry their burden under the *Winter* factors).

### D. The terms of the district court's mandatory preliminary injunction are vague and overbroad and thus conflict with the PLRA.

Under Federal Rule of Civil Procedure 65(d), a preliminary injunction order must "state its terms specifically" and "describe in reasonable detail . . . the act or acts restrained or required." That rule "was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood." *Melendres v. Skinner*, 113 F.4th 1126, 1139 (9th Cir. 2024) (quoting *Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1047 (9th Cir. 2013)). This Court will set aside injunctions when they are "so vague that they have no reasonably specific meaning." *Id.* at 1140 (quoting *A&M Recs., Inc. v. Napster, Inc.*, 284 F.3d 1091, 1097 (9th Cir. 2002)).

Here, relying on its clearly erroneous factual finding, the district court ruled that "now, instead of the categorical default placement in a men's facility, the default will be to house the transgender inmate at CCCF or other alternative, safer housing." 1-ER-44. And on reconsideration, the court clarified that the new default it ordered "applies as a starting point for each assessment, which

should begin with the default presumption that an AIC should be housed consistently with their gender identity (unless there exists a documented and articulable security justification), and then the assessment should continue from there," 1-ER-14, but it provided no guidance for how that differs from ODOC's existing policies.

The court then crafted preliminary injunction terms that purported to reflect those policies. *See* 1-ER-3–4; *see also* 1-ER-17 (explaining that plaintiffs' "requested relief is very nearly the same system that ODOC purports to use already"). But the court did not simply order defendants to comply with their existing policies. Instead, the court impermissibly added terms that were either premised on its clearly erroneous factual finding or so vague and overbroad that defendants cannot definitively know whether they are complying with the mandatory preliminary injunction.

First, a primary term in the preliminary injunction is premised on the district court's clearly erroneous factual finding, ordering defendants to refrain from actions they have not taken. The court ordered defendants to "[i]mmediately end the categorical housing of transgender women in men's facilities without individualized safety assessments." 1-ER-3. But defendants demonstrated that no such practice exists, and plaintiffs offered no evidence to the contrary.

Conversely, multiple phrases in the terms order defendants to take actions that they already take. *See* 1-ER-3–4. The record shows that defendants already conduct individualized assessments and take into consideration a variety of factors, including an AIC's gender identity, to determine housing placements (Term 1); provide safe, non-punitive housing options for transgender women (Term 2); ensure transgender women have access to appropriate showers and shower schedules (Term 4); provide confidential and non-retaliatory reporting mechanisms for sexual misconduct (Term 6); provide mental health support for transgender women AICs who report sexual misconduct (Term 7); and consider an AIC's preferences (Term 8). *See, e.g.*, Add-1–14; 2-ER-232–42, 145–48.

In short, the court provided no guidance as to what, if anything, defendants need to change in their existing practices.

The court, moreover, included phrases so vague that defendants have no way of knowing whether they are complying with the preliminary injunction's terms except through trial and error while under threat of contempt. For instance, although defendants already prohibit housing vulnerable AICs with aggressive AICs, the court ordered defendants to prohibit housing transgender women with cisgender cellmates "known to have a history of sexual or serious physical violence." 1-ER-3. The court does not explain what "serious"

physical violence means, nor how defendants can assess whether past violence is sufficiently serious in the prison context, where most AICs have a history of violence. Other terms contain the same defects: the court requires separate showers or shower schedules that "provide *reasonable* bodily privacy"; mandates unclothed searches of transgender women AICs to be conducted by female staff "absent *extraordinary*, documented circumstances"; and permits AICs to "decline any of these protections with *informed*, *voluntary* consent after a *meaningful review* of options." 1-ER-3–4.

None of those terms has a reasonably specific meaning. Indeed, this Court recently held that "reasonably necessary," "active resistance," and "legally justified" are impermissibly vague terms for an injunction. *Dickinson v. Trump*, 174 F.4th 634, 650 (9th Cir. 2026).

Several of the terms are also overbroad and improperly "require more of state officials than is necessary to assure their compliance with federal law." *Simon v. City & County of San Francisco*, 135 F.4th 784, 796 (9th Cir. 2025). For instance, the injunction requires female staff to conduct any unclothed search of transgender women AICs and prohibits cross-gender strip searches otherwise. 1-ER-3. It also requires defendants to provide "voluntary transgender or gender non-conforming housing units within existing facilities," *id.*, even though PREA standards advise against transgender-only units, *see* 2-

ER-236. In any event, ODOC's existing policies already address the concerns underlying those overbroad terms: ODOC prohibits housing potentially vulnerable AICs with potentially aggressive AICs (Terms 1, 2, and 3), and ODOC accommodates transgender women AICs' stated preference for unclothed searches subject to staff availability and other factors (Term 5). *See, e.g.*, Add-1–14; 2-ER-232–42, 145–48.

Finally, the injunction is inconsistent with the PLRA. A federal court must generally defer to a state's management and administration of its prisons. *See Turner v. Safley*, 482 U.S. 78, 84–85 (1987) (explaining that "[r]unning a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government"); *see also Woodford v. Ngo*, 548 U.S. 81, 94 (2006) (noting that it is "difficult to imagine an activity in which a State has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures, than the administration of its prisons" (quotation marks omitted)). And in "scrutiniz[ing] claims of cruel and unusual confinement, . . . courts cannot assume that state legislatures and prison officials are insensitive to the requirements of the Constitution or to the perplexing sociological problems of how best to achieve the goals of the penal function in the criminal justice

system[.]" *Rhodes v. Chapman*, 452 U.S. 337, 352 (1981). For those reasons, the PLRA mandates that "[p]reliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm." 18 U.S.C. § 3626(a)(2).

Here, the injunction's vague and overbroad terms fail that admonition. At bottom, the district court is micromanaging the state's administration of its prison system, and it is well established that district courts "may not micromanage prison administration" under the PLRA. *Porretti v. Dzurenda*, 11 F.4th 1037, 1051 (9th Cir. 2021) (citing *Armstrong v. Brown*, 768 F.3d 975, 983 (9th Cir. 2014)); *see also, e.g.*, *Valentine v. Collier*, 956 F.3d 797, 806 (5th Cir. 2020) (per curiam) ("[M]icromanagement, enforced upon threat of contempt, does not reflect the principles of comity commanded by the PLRA."); *Gates v. Cook*, 376 F.3d 323, 338 (5th Cir. 2004) ("While federal courts can certainly enter injunctions to prevent Eighth Amendment violations, they are not to micromanage state prisons." (citing *Bell v. Wolfish*, 441 U.S. 520, 562 (1979))). Indeed, the Supreme Court cautioned against such micromanagement over four decades ago:

> There was a time not too long ago when the federal judiciary took a completely "hands-off" approach to the problem of prison administration. In recent years, however, these courts largely have discarded this "hands-off" attitude and have waded into this

> complex arena. . . . But many of these same courts have, in the name of the Constitution, become increasingly enmeshed in the minutiae of prison operations. Judges, after all, are human. They, no less than others in our society, have a natural tendency to believe that their individual solutions to often intractable problems are better and more workable than those of the persons who are actually charged with and trained in the running of the particular institution under examination. But under the Constitution, the first question to be answered is not whose plan is best, but in what branch of the Government is lodged the authority to initially devise the plan.

*Bell*, 441 U.S. at 562. And a higher court's intervention is especially warranted where, as here, a district court "order[s] relief that would require for its enforcement the continuous supervision by the federal court over the conduct of state officers[.]" *Armstrong*, 768 F.3d at 983 (alteration, quotation marks, and citations omitted).

## II. The district court abused its discretion by provisionally certifying the class.

Where a district court's provisional class certification "depended on, and was in service of," an infirm preliminary injunction, "the class certification order necessarily falls as well, regardless of whether class certification was otherwise proper under Federal Rule of Civil Procedure 23." *Fraihat v. U.S. Immigr. & Customs Enf't*, 16 F.4th 613, 635 (9th Cir. 2021). Because the district court's provisional class certification depended on, and was in service of, its invalid mandatory preliminary injunction, that provisional class

certification necessarily fails as well. To vacate the provisional class certification, this Court need not proceed further.

But even if this Court decides to review that decision separately from the injunction, the district court's provisional class certification fails under Federal Rule of Civil Procedure 23. "A plaintiff seeking class certification bears the burden of affirmatively demonstrating through evidentiary proof that the class meets the prerequisites of Rule 23(a)." *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1003–04 (9th Cir. 2018) (citation and quotation marks omitted). As discussed, the evidence in the record showed that ODOC houses transgender women AICs on a case-by-case basis after considering a variety of factors. Critically, plaintiffs offered no evidence to the contrary. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) ("Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc.").

Despite the evidence in the record, the district court's Rule 23 analysis rested on the same clearly erroneous factual finding that ODOC has a default presumption for housing transgender women AICs in men's prisons. For instance, the court determined that commonality was satisfied because

"Plaintiffs' claims relate to ODOC's systemic treatment of transgender women that preferences housing them, categorically, in men's prisons, such that they are exposed to a substantial risk of violence and sexual assault; these are allegations that can be resolved on a class-wide basis." 1-ER-48; *see also* 1-ER-49 (reasoning that commonality is satisfied because "Plaintiffs contend that ODOC staff on every level knew of and were deliberately indifferent to the substantially high risk of violence and sexual assault created by a policy of categorically preferencing housing for transgender women in men's prison facilities"). The court also concluded that typicality was satisfied because ODOC "is alleged to have been deliberately indifferent to the significant risk created by preferencing placement in men's prisons." 1-ER-50; *see also* 1-ER-51 (concluding that typicality is satisfied because "the alleged constitutional violations at issue are alleged to be applicable to all transgender women who are housed in men's prisons by categorical default, regardless of the specific facts of their case or their potential status as 'potentially aggressive'").[6] The district court thus abused its discretion by provisionally certifying the class.

---

[6] The commonality and typicality requirements "tend to merge with the adequacy-of-representation requirement." *Dukes*, 564 U.S. at 349 n.5. The latter requirement encompasses the adequacy of both the representative parties and class counsel. *Sali*, 909 F.3d at 1007.

Moreover, even putting aside the district court's clearly erroneous factual finding, class certification is not appropriate for transgender AICs in ODOC custody precisely because—as it would appear everyone involved in this case would agree—their needs are highly individualized. As such, no single remedy is likely to meet the needs of every transgender AIC (many of whom might in fact have conflicting preferences), and litigation as a class is not proper.

For all those reasons, the district court abused its discretion by provisionally certifying the class.

## CONCLUSION

This Court should vacate the district court's preliminary-injunction and class-certification orders.

Respectfully submitted,

DAN RAYFIELD #064790
Attorney General
PAUL L. SMITH #001870
Solicitor General
ROBERT A. KOCH #072004
Attorney-in-Charge,
Civil & Administrative Appeals

/s/ Ariel T. Ashtamker

ARIEL T. ASHTAMKER #260068
Assistant Attorney General
ariel.ashtamker@doj.oregon.gov

Attorneys for Defendants-Appellants
Mike Reese, Ryan LeGore, Jeremy
Wagner, Mark Nooth, Erin Reyes, and
State of Oregon

# ADDENDUM

# TABLE OF CONTENTS

| | PAGE |
|---|---|
| ODOC Policy 40.1.13 | Add-1 – Add-14 |

| DEPARTMENT OF CORRECTIONS<br>Institutions | |
|---|---|
| **Title:** Prison Rape Elimination Act | **DOC Policy: 40.1.13** |
| **Effective:** 1/20/2022 | **Supersedes: 11/20/18** |
| **Applicability:** All DOC employees, contractors, and volunteers | |

**Directives Cross-Reference:**
- Investigations – 70.1.4
- Administrative Housing – Div 046
- Prohibited Conduct and Processing Disciplinary Actions – Div 105
- Procedure in the Event of Sexual Abuse – P-F-06.1
- Mental Health Codes and Levels of Services – MH-G-01.1

**Attachments:**
- PREA Reporting Flowchart
- Form – OIC PREA Checklist (CD 1621)
- Form – Staff Reporting Responsibilities (CD 1620)
- Form – PREA Acknowledgement Statement (CD 1623)

## I. PURPOSE

This document provides uniform guidelines and procedures to reduce the risk of prison sexual abuse and sexual harassment. The department has a zero-tolerance for sexual abuse and sexual harassment.

**A.** The department will immediately respond to, investigate, and support the prosecution of sexual abuse and sexual harassment in Oregon's prisons, both internally and externally in partnership with law enforcement and county prosecutors.

**B.** Through continual education of staff and adults in custody (AIC), the department will increase awareness of safe reporting mechanisms and available services to victims and concerned citizens, thereby creating institutional cultures that discourage sexual abuse and sexual harassment and misconduct.

**C.** Through classification, assignment, review of new technologies, and improvements to institution architecture where feasible, the department will identify opportunities to separate and carefully monitor sexually abused and vulnerable AICs and sexual abusers and victims to reduce the incidence of sexual misconduct.

**D.** The department will establish data collection systems to accurately track sexual abuse and sexual harassment, facilitate identification of the core causal factors, and annually incorporate 'lessons learned' into improved operations and services toward a sustainable zero-tolerance standard.

## II. DEFINITIONS

**A. Adult in Custody (AIC)**: Any person under the supervision of the Oregon Department of Corrections who is not on parole, probation, or post-prison supervision status.

**B. Agency PREA Coordinator**: An administrator responsible for the development,

implementation, and oversight of the department's compliance with the PREA standards in all the department's facilities.

**C. Gender Nonconforming**: A person whose appearance or manner does not conform to traditional societal gender expectations.

**D. Inspector General Hotline**: Special posted telephone number(s) designated for AICs and staff to call in and report any alleged misconduct on the part of any DOC AICs or staff. The caller provides information on a message answering machine that is reviewed every business day by the Inspector General's Office.

**E. Intersex**: A person whose sexual or reproductive anatomy or chromosomal pattern does not seem to fit typical definitions of male or female. Intersex medical conditions are sometimes referred to as disorders of sex development.

**F. Non-Assaultive Sexual Activity**: Engaging in sexual activity and the sexual activity is conducted without violence, threat of violence, coercion, or use of a weapon.

**G. PREA Compliance Manager**: A management staff person designated by the institution functional unit manager, with sufficient time and authority to coordinate the facility's efforts to comply with the federal PREA standards.

**H. Sexual Abuse**: Sexual abuse of an AIC by another AIC and sexual abuse of an AIC by a staff member.

1. Sexual abuse of an AIC by another AIC includes any of the following acts, if the victim does not consent, is coerced into such act by overt or implied threats of violence, or is unable to consent or refuse:
    a. Contact between the penis and the vulva or the penis and the anus, including penetration, however slight;
    b. Contact between the mouth and the penis, vulva, or anus;
    c. Penetration of the anal or genital opening of another person, however slight, by a hand, finger, object, or other instrument; and
    d. Any other intentional touching, either directly or through the clothing, of the genitalia, anus, groin, breast, inner thigh, or the buttocks of another person, excluding contact incidental to a physical altercation.
2. Sexual abuse of an AIC by a staff member, contractor or volunteer includes any of the following acts, with or without consent of the AIC, detainee, or resident:
    a. Contact between the penis and the vulva or the penis and the anus, including penetration, however slight;
    b. Contact between the mouth and the penis, vulva, or anus;
    c. Contact between the mouth and any body part where the staff member, contractor, or volunteer has the intent to abuse, arouse or gratify sexual desire;
    d. Penetration of the anal or genital opening, however slight, by a hand, finger, object, or other instrument, that is unrelated to official duties or where the staff member, contractor, or volunteer has the intent to abuse, arouse, or gratify sexual desire;
    e. Any other intentional contact, either directly or through the clothing, of or with the genitalia, anus, groin, breast, inner thigh, or the buttocks that is unrelated to the official duties or where the staff member, contractor, or volunteer has the intent to abuse, arouse or gratify sexual desire;

f. Any attempt, threat, or request by a staff member, contractor, or volunteer to engage in the activities described by paragraphs (A) – (E) of this section;

g. Any display by a staff member, contractor, or volunteer of their uncovered genitalia, buttocks, or breast in the presence of an AIC, detainee, or resident; and

h. Voyeurism by a staff member, contractor, or volunteer. Voyeurism by a staff member, contractor or volunteer means an invasion of privacy of an AIC by staff for reasons unrelated to official duties, such as peering at an AIC who is using a toilet in their cell to perform bodily functions; requiring an AIC to expose their buttocks, genitals, or breasts; or taking images of all or part of an AIC's naked body or of an AIC performing bodily functions.

**I. Sexual Abuse Liaison**: A management staff person designated by the institution functional unit manager to coordinate response, reporting, and monitoring of AIC abuse within that institution. The sexual abuse liaison shall be assigned as the Sexual Abuse Response Team (SART) leader.

**J. Sexual Abuse Response Team (SART)**: A team of institution staff consisting of (at a minimum) a Behavioral Health Services (BHS) staff member designated by BHS Administration, a Medical Services staff member, and the sexual abuse liaison who are designated by the institution functional unit manager to respond to all allegations of AIC sexual abuse or sexual coercion. For the purposes of SART activation, minimum institutions that do not have BHS staff on site will be assigned a SART member by the Behavioral Health Services administrator.

**K. Sexual Coercion**: Compelling or inducing another person to engage in sexual abuse by deceit, threats, force, intimidation, or for personal favors.

**L. Sexual Harassment**: Repeated and unwelcome sexual advances, requests for sexual favors, or verbal comments, gestures, or actions of a derogatory or offensive sexual nature by one AIC directed toward another, and repeated verbal comments or gestures of a sexual nature to an AIC by a staff member, contractor or volunteer, including demeaning references to gender, sexually suggestive or derogatory comments about body or clothing, or obscene language or gestures.

**M. Sexual Solicitation**: The solicitation of another person to engage in sexual activity.

**N. Staff**: For purposes of this policy staff includes DOC employees, Oregon Corrections Enterprise (OCE) employees, contract service providers, and volunteers.

**O. Sexual Abuse Victim**: Any AIC who, through documentation, evidence, or as result of reasonable suspicion on the part of staff, has suffered sexual coercion, sexual solicitation, sexual harassment, or sexual abuse by another AIC or a staff person during incarceration.

**P. Substantiated Allegation**: An allegation that was investigated and determined to have occurred.

**Q. Transgender**: A person whose gender identity (i.e. internal sense of feeling male or female) is different from a person's assigned sex at birth.

R. **Unfounded Allegation**: An allegation that was investigated and determined not to have occurred.

S. **Unsubstantiated Allegation:** An allegation that was investigated and produced insufficient evidence to make a final determination as to whether or not the event occurred.

## III. POLICY

### A. PREVENTION PLANNING

1. DOC staff must be able to recognize the signs of sexual abuse and sexual harassment and understand their responsibility in the detection, prevention, response, and reporting of an alleged sexual abuse or sexual harassment.
2. Security staffing standards and deployment of video monitoring systems or technology shall be assessed for adjustments and documented by the PREA Compliance Managers for facilities affected and communicate to the Agency PREA Coordinator.
3. Each facility shall require intermediate and higher-level supervisors to conduct and document unannounced rounds on all shifts to deter staff sexual abuse and sexual harassment. Staff are prohibited from alerting other staff members that the supervisory rounds are occurring.
4. Each institution shall implement policies and procedures that enable AICs to shower, perform bodily functions, and change clothing without nonmedical staff of the opposite gender viewing their breasts, buttocks, or genitalia, except in exigent circumstances or when such viewing is incidental to routine cell checks.
5. Opposite gender staff shall announce themselves prior to entering an AIC housing unit by the method approved by the agency.
6. When the Oregon Department of Corrections learns that an AIC is subject to a substantial risk of imminent sexual abuse, it will take immediate action to protect the AIC.
7. When designing or acquiring any new facility and in planning any substantial expansion or modification of existing facilities, the department shall consider the effect of the design, acquisition, expansion, or modification upon the agency's ability to protect AICs from sexual abuse.
8. When installing or updating a video monitoring system, electronic surveillance system, or other monitoring technology, the agency shall consider how such technology may enhance the agency's ability to protect AICs from sexual abuse.
9. The department shall ensure that each facility it operates develops and documents a staffing plan that provides for adequate levels of staffing to protect AICs against sexual abuse.
10. The agency shall not place lesbian, gay, bisexual, transgender, or intersex AICs in dedicated facilities, units, or wings solely on the basis of such identification or status, unless such placement is in a dedicated facility, unit, or wing established in connection with a consent decree, legal settlement, or legal judgment for the purpose of protecting such AICs.

### B. TRAINING AND EDUCATION

**1. Staff Training**

1. DOC employees will receive PREA training every two years. The agency shall provide refresher information on current sexual abuse and sexual harassment policies on years when trainings are not conducted.

2. The department shall train staff responsible for the supervision of AICs in how to conduct cross-gender pat-down searches, and searches of transgender and intersex AICs, in a professional and respectful manner, and in the least intrusive manner possible, consistent with security needs.

3. The department shall train staff on how to communicate effectively and professionally with AICs, including lesbian, gay, bisexual, transgender, intersex, or gender nonconforming AICs.

4. The department shall ensure that all volunteers and contractors who have contact with AICs have been trained on their responsibilities based on the services they provide and level of contact they have with AICs, but all volunteers and contractors who have contact with AICs shall be notified of the agency's zero-tolerance policy regarding sexual abuse and sexual harassment and informed how to report such incidents.

5. In addition to general training provided to all employees, contractors and volunteers the agency shall ensure that specialized training is required of Health Services practitioners, SART members, DOC investigators, and other staff identified by the department.

6. The Professional Development Unit (PDU) will be responsible for the development and implementation of curriculum for new employee orientation and annual training in consultation with the Agency PREA Coordinator.

**2. AIC Education**

a. Upon admission to DOC custody AICs will receive information about:

(1) The agency's zero-tolerance policy regarding sexual abuse and sexual harassment;

(2) How to avoid risk situations related to sexual abuse and harassment;

(3) How to safely report allegations or suspicion of sexual abuse or sexual harassment, sexual coercion, and sexual solicitation;

(4) How to obtain mental health services and/or medical services if victimized;

(5) What the risks and potential consequences are for engaging in any type of sexual activity while incarcerated;

(6) An AIC's right to be free from sexual abuse and harassment;

(7) An AIC's right to be free from retaliation from reporting such incidents; and

(8) The agencies policies and procedures for responding to such incidents.

b. The department shall ensure that key information is continuously and readily available or visible to AICs through posters, AIC handbooks, or other written formats.

c. Each institution will display posters or other materials, in appropriate locations to include housing units and common areas where AICs gather, which are designed to inform all AICs:

(1) That DOC has a zero-tolerance toward sexual abuse and sexual harassment;

(2) That all AICs are encouraged to report any and all instances of sexual abuse or sexual harassment; and

(3) The current methods available for reporting.

d. The agency shall provide AIC education in formats accessible to all AICs, including those who are limited English proficient, deaf, visually impaired, or otherwise disabled, as well as to AICs who have limited reading skills.

## C. SCREENING FOR RISK OF SEXUAL VICTIMIZATION AND ABUSIVENESS

The department shall provide housing assignments that reduce the likelihood of sexual abuse and sexual harassment while an AIC is in DOC custody.

1. AICs will be assessed within 72 hours of arrival at all DOC facilities and again within 30 days to determine whether they meet specific criteria indicating either vulnerability or likelihood of perpetrating sexual abuse. AICs may not be disciplined for refusing to answer, or for failing to disclose information regarding the assessment questions.

   a. Vulnerable AICs: AICs will be evaluated at Intake to specifically determine their vulnerability to sexual abuse as indicated by the following risk factors:

      (1) Age;

      (2) Physical stature;

      (3) Mental, physical, or developmental disability;

      (4) Sex offense convictions;

      (5) First time offender status (first time in DOC custody);

      (6) Past history of sexual victimization;

      (7) AIC's own perception of vulnerability;

      (8) Whether the AIC is or is perceived to be lesbian, gay, bisexual, transgender, intersex, or gender nonconforming; and

      (9) Whether the AIC's criminal history is exclusively nonviolent.

   b. Aggressive AICs: AICs will be evaluated to specifically determine if there are indications that they may be a sexually abusive AIC, or are prone to victimize other AICs, especially in regard to sexual behavior. The initial screening shall consider prior acts of sexual abuse, prior convictions for violent offenses, and history of prior institutional violence or sexual abuse, as known to the agency, in assessing AICs for risk of being sexually abusive. DOC shall not consider lesbian, gay, bisexual, transgender, or intersex identification or status as an indicator of likelihood of being sexually abusive.

   c. An AIC should be identified for potential vulnerability or potential aggressiveness by utilizing an objective risk screening tool unless there is sufficient documentation by the reviewer to warrant concern.

   d. An AIC's risk level shall be reassessed when warranted due to a referral, request, incident of sexual abuse, or receipt of additional information that bears on the AIC's risk of sexual victimization or abusiveness.

   e. AICs at high risk for sexual victimization shall not be placed in administrative housing unless an assessment of all available alternatives determines that there is no available alternative means of separation from likely abusers. If a facility cannot

conduct such an assessment immediately, the facility may hold the AIC in administrative housing for less than 24 hours while completing the assessment.

(1) AICs placed in administrative housing for this purpose shall have access to programs, privileges, education, and work opportunities to the extent possible. If the facility restricts access to programs, privileges, education, or work opportunities, the facility shall document:

- The opportunities that have been limited;
- The duration of the limitation; and
- The reasons for such limitations.

(2) The facility shall assign such AICs to administrative housing only until an alternative means of separation from likely abusers can be arranged. Such an assignment shall not ordinarily exceed a period of 30 days. An AIC placed in involuntary administrative housing exceeding 30 days will receive a hearing by a hearings officer in accordance with the rule on **Administrative Housing** (OAR 291-046).

(3) If an administrative housing assignment is made, the officer-in- charge shall clearly document:

- The basis for the facility's concern for the AICs safety; and
- The reason why no alternative means of separation can be arranged.

(4) Every 30 days, the facility shall afford each such AIC a review to determine whether there is a continuing need for separation from the general population.

f. In deciding AIC housing and programming assignments for transgender or intersex AICs, the department shall consider on a case-by-case basis whether a placement would ensure the AIC's health and safety, and whether the placement would present management or security problems.

(1) If requested, transgender and intersex AICs shall be given the opportunity to shower separately from other AICs.

(2) A transgender or intersex AIC's own views with respect to their own safety shall be given serious consideration.

2. The PREA Compliance Manager or designee will review placement and programming assignments for each transgender or intersex AIC at least twice each year to review any threats to safety experienced by the AIC.

3. The department makes individualized determinations about how to ensure the safety of each AIC including housing, work assignments and access to services.

4. The department shall use information from the risk screening to inform housing, bed, work, education, and program assignments with the goal of keeping separate those AICs at high risk of being sexually victimized from those at high risk of being sexually abusive.

## D. REPORTING

### 1. AIC Reporting

a. Access to services for the victims of sexual abuse, sexual solicitation, sexual harassment, or sexual coercion will not be dependent on the victim's willingness to report or provide testimony; however, in large measure, the reporting is critical to

the timely delivery of necessary services to the victim and holding perpetrators accountable.

b. AICs are encouraged to report when either of the following conditions exists:

(1) The AIC has been or is currently a victim of sexual abuse, sexual solicitation, sexual harassment, or sexual coercion while incarcerated; or

(2) The AIC has knowledge or suspicions of sexual abuse, sexual solicitation, sexual harassment, or sexual coercion having occurred or occurring in a correctional institution, or any staff neglect or violation of responsibilities that may have contributed to such an incident.

a) AICs who report to DOC staff that they have been sexually abused or have knowledge or suspicions of another AIC who has been sexually abused, sexually solicited, sexually harassed, or sexually coerced, do so with the understanding that DOC staff will investigate and where appropriate, refer to the Oregon State Police and Special Investigations Unit.

b) Information provided by AICs to DOC staff will be subject to verification by investigators. Information provided in confidential communications to the DOC staff listed below will be shared consistent with and according to the standards required by state statute, professional licensure, and ethical standards.

- DOC Medical Services staff
- Behavioral Health Services staff
- Chaplains

c) When interviewing AICs concerning sexual abuse, sexual solicitation, sexual harassment, and sexual coercion, all DOC staff will inform AICs of any limits to confidentiality prior to conducting the interview.

c. PREA information collected during investigations or intake assessments is considered sensitive and should only be shared with those staff with a need to know as part of their assigned duties.

d. Under no circumstances should access to treatment resources be denied an AIC victim solely because the AIC will not fully disclose details to investigative staff or Health Services staff.

e. The credibility of an alleged victim, suspect, or witness shall be assessed on an individual basis and shall not be determined by the person's status as AIC or staff. DOC will not require an AIC who alleges sexual abuse to submit to a polygraph examination or other truth-telling device as a condition for proceeding with the investigation of such an allegation.

f. The agency may discipline an AIC for alleging sexual abuse, only when it is in bad faith. A report of sexual abuse made in good faith based upon a reasonable belief that the alleged conduct occurred shall not constitute falsely reporting an incident or lying, even if an investigation does not establish evidence sufficient to substantiate the allegation. Abusers shall be disciplined in accordance with (OAR 291-105) **Prohibited Conduct and Processing Disciplinary Actions**.

g. AIC interpreters, AIC readers, or other types of AIC assistants should not be used except in limited circumstances where an extended delay in obtaining an effective interpreter could compromise the AIC's safety, the performance of first-response duties, or the investigation of the AIC's allegations.

**2. Staff Reporting**

a. All staff will report immediately any knowledge, suspicion, or information regarding sexual abuse, sexual harassment, retaliation by AIC or staff for reporting, or staff neglect or violation of responsibility that may have contributed to such incidents. When an AIC reports sexual abuse, sexual solicitation, sexual harassment, or sexual coercion to DOC staff members, staff will, except as noted elsewhere in this policy, contact the OIC or supervisor immediately.

b. The OIC will initiate action as outlined in this policy and the OIC PREA Checklist (CD 1621) to mitigate:

(1) Immediate harm to the victim or reporter; and/or

(2) Damage to potential crime scenes or evidence.

c. The Department of Corrections, through the Inspector General's Office, shall offer a "PREA Hotline" to accept recorded reports of sexual abuse or sexual harassment in DOC institutions or other areas under DOC control. Staff may utilize the Inspector General's Hotline or the Governor's Office to privately report all allegations of sexual abuse or sexual harassment. Such reports will be investigated within the limitations of information provided. When the victims of sexual abuse, sexual solicitation, sexual harassment, or sexual coercion can be identified by investigators, they will be offered access to necessary services available through DOC, regardless of their willingness to report or provide testimony.

d. Staff shall accept reports made verbally, in writing, anonymously, and from third parties and shall promptly document any reports. Upon notification by an AIC that they have been sexually abused or coerced into unwanted sexual contact, the staff member shall immediately complete the Staff Reporting Responsibilities form (CD 1620). (See the attached PREA Reporting Chart.)

e. If the alleged victim is under the age of 18 or considered a vulnerable adult under a state or local vulnerable persons statute, the department shall report the allegation to the designated State or local services agency under applicable mandatory reporting laws.

**E. OFFICIAL RESPONSE FOLLOWING AN AIC REPORT**

1. Upon receiving an allegation that an AIC was sexually abused while confined at another facility, the head of the facility that received the allegation shall notify the head of the facility or appropriate office of the agency where the alleged abuse occurred.

   a. Such notification shall be provided as soon as possible, but no later than 72 hours after receiving the allegation.

   b. The agency shall document that it has provided such notification.

   c. The facility head or agency office that receives such notification shall ensure that the allegation is investigated.

2. The PREA Compliance Manager shall be responsible for monitoring all AICs and staff who report sexual abuse or sexual harassment or cooperate with sexual abuse or sexual harassment investigations from retaliation by other AICs or staff.

   a. Monitoring will continue for at least 90 days following a report of sexual abuse. The PREA Compliance Manager shall monitor the conduct and treatment of AICs or staff who reported the sexual abuse and of AICs who were reported to have

suffered sexual abuse to see if there are changes that may suggest possible retaliation by AICs or staff, and shall act promptly to remedy any such retaliation.

b. All actions taken to remedy any such retaliation will be documented and forwarded to the Agency PREA Coordinator and the sexual abuse liaison.

c. Items the agency should monitor include:

(1) AIC disciplinary reports;

(2) Housing assignments;

(3) Program changes; and

(4) Negative performance reviews or reassignments of staff.

d. In the case of AICs, such monitoring shall also include periodic status checks.

e. The agency shall continue such monitoring beyond 90 days if the initial monitoring indicates a continuing need.

f. If any other individual who cooperates with an investigation expresses a fear of retaliation, the agency shall take appropriate measures to protect that individual against retaliation.

g. An agency's obligation to monitor shall terminate if the agency determines that the allegation is unfounded

**F. AIC ACCESS TO OUTSIDE CONFIDENTIAL SERVICES**

1. The department shall make available to AICs mailing addresses and telephone numbers, (including toll-free crisis line numbers where available), of local, State, or national victim advocacy or rape crisis organizations and outside victim advocates for emotional support services related to sexual abuse. The facility shall enable reasonable communication between AICs and these organizations and agencies, in as confidential a manner as possible.

2. As requested by the AIC, a victim advocate shall accompany and support the AIC through the forensic medical examination and investigatory interview providing emotional support, crisis intervention, information, and referrals.

**G. INVESTIGATIONS**

1. Allegations of sexual abuse or sexual harassment of an AIC by a staff member as defined in this policy will be reviewed and referred to the appropriate investigator as specified in the DOC policy on **Investigations** 70.1.4.

2. Allegations of sexual abuse or sexual harassment of an AIC by an AIC will be referred to the appropriate investigator as specified in the DOC policy on **Investigations** 70.1.4.

3. Reporting to AICs: In the event of an AIC allegation of sexual abuse, the PREA compliance manager shall:

   a. Following an investigation into an AIC's allegation that they suffered sexual abuse in an agency facility, the PREA Compliance Manager or designee at that facility shall inform the AIC as to whether the allegation has been determined to be substantiated, unsubstantiated, or unfounded;

   b. If the agency did not conduct the investigation, it shall request the relevant information from the investigative agency in order to inform the AIC;

   c. Following an AIC's allegation that a staff member has committed sexual abuse against the AIC and the findings are substantiated or unsubstantiated; the PREA

Compliance Manager or designee shall inform the AIC whenever:

(1) The staff member is no longer posted within the AIC's unit;

(2) The staff member is no longer employed at the facility;

(3) The agency learns that the staff member has been indicted on a charge related to sexual abuse within the facility; and/or

(4) The agency learns that the staff member has been convicted on a charge related to sexual abuse within the facility.

d. All such notifications or attempted notifications shall be documented by the PREA Compliance Manager or designee.

e. The PREA Compliance Manager or designee's obligation to report shall terminate if the AIC is released from the department's custody.

f. The departure of the alleged abuser or victim from the employment or control of the facility or agency shall not provide a basis for terminating an investigation.

g. DOC shall impose no standard higher than a preponderance of evidence in determining whether allegations of sexual abuse or sexual harassment are substantiated.

**H. MEDICAL AND MENTAL CARE**

It is the intention of DOC that there will be no long-term forfeiture of services and programs for victims of sexual abuse, sexual coercion, sexual harassment, or sexual solicitation. Recognizing that the safety of the victim is paramount, the least restrictive housing program assignments will be implemented to achieve that goal.

1. Medical: Medical access to services for victims of sexual abuse will be handled in accordance with Health Services policy on procedure #P-F-06.1 (**Procedure in the Event of Sexual Abuse**) that includes:

   a. Timely, unimpeded access to emergency medical treatment without financial cost as determined by the medical practitioners' professional judgment;

   b. Necessary post event treatment including coordination with community hospitals;

   c. Testing and prophylactic treatment for sexually transmitted infections (STI);

   d. Comprehensive information and timely access to all lawful pregnancy related medical services;

   e. Referral to Behavioral Health Services; and

   f. Communication with the sexual abuse liaison regarding any information deemed not confidential.

2. Behavioral Health Services: Mental health services for victims of sexual abuse will be provided in accordance with Behavioral Health Service policies and procedures which include:

   a. Timely, unimpeded access to appropriate mental health evaluation services without financial cost as determined by the mental health treatment providers' professional judgment;

   b. Comprehensive information of limits of confidentiality and duty to report;

   c. Completion of a mental health evaluation to include a suicide risk screening interview;

   d. Notification to the OIC and Medical Services regarding recommended actions that

may include suicide precautions;

e. Provision of follow-up mental health services.

f. Communication with the PREA Compliance Manager regarding any information deemed not confidential; and

g. Consultation with the OIC and Medical Services regarding suicide precaution measures that will be implemented if the AIC is housed at an institution where there are no mental health services on site.

## I. DISCIPLINARY ACTIONS FOR STAFF, CONTRACTORS AND VOLUNTEERS

1. Staff shall be subject to disciplinary sanctions up to and including termination for violating agency sexual abuse or sexual harassment policies.
2. Termination shall be the presumptive disciplinary sanction for staff who have engaged in sexual abuse.
3. Disciplinary actions for violations of agency policies relating to sexual abuse or sexual harassment (other than actually engaging in sexual abuse) shall be commensurate with the nature and circumstances of the acts committed, the staff member's disciplinary history, and the sanctions imposed for comparable offenses by other staff with similar histories.
4. All terminations for violations of agency sexual abuse or sexual harassment policies, or resignations by staff who have been terminated if not for their resignation, shall be reported to law enforcement agencies, unless the activity was clearly not criminal, and to any relevant licensing bodies.
5. Any contractor or volunteer who engages in sexual abuse shall be prohibited from contact with AICs and shall be reported to law enforcement agencies, unless the activity was clearly not criminal, and to relevant licensing bodies.
6. The facility shall take appropriate remedial measures and shall consider whether to prohibit further contact with AICs, in the case of any other violation of agency sexual abuse or sexual harassment policies by contractor or volunteer.

## J. DATA COLLECTION AND REVIEW

1. The department shall collect information related to the purposes outlined at the beginning of this policy; specifically, to gather data that will help DOC reduce the risk that sexual abuse and/or sexual harassment would occur within DOC facilities.
2. The facility shall conduct a sexual abuse incident review at the conclusion of every sexual abuse investigation, including where the allegation has not been substantiated, unless the allegation has been determined to be unfounded. Such review shall ordinarily occur within 30 days of the conclusion of the investigation. The review team shall include upper-level management officials, with input from line supervisors, investigators, and medical or mental health practitioners. The review team shall:

a. Consider whether the allegation or investigation indicates a need to change policy or practice to better prevent, detect, or respond to sexual abuse;

b. Consider whether the incident or allegation was motivated by race, ethnicity, gender identity, lesbian, gay, bisexual, transgender or intersex identification, status, or perceived status; or gang affiliation; or was motivated or otherwise caused by other group dynamics at the facility;

c. Examine the area in the facility where the incident allegedly occurred to assess whether physical barriers in the area may enable abuse;

d. Assess the adequacy of staffing levels in that area during different shifts;

e. Assess whether monitoring technology should be deployed or augmented to supplement supervision by staff; and

f. Prepare a report of its findings, including but not necessarily limited to determinations made and any recommendations for improvement and submit such report to the PREA Compliance Manager, Superintendent, Agency PREA Coordinator, and when the allegation is substantiated, Institutions Administrator.

g. The facility shall implement the recommendations for improvement or shall document its reasons for not doing so.

h. The Agency PREA Coordinator shall be responsible to identify the specific data that must be collected and to work with the PREA Compliance Manager from each institution to assure data is submitted within the required timeframe. The agency also shall obtain incident-based and aggregated data from every private facility with which it contracts for the confinement of its AICs. This data will be compiled in annual reports for submission to the Director. The Agency PREA Coordinator will prepare the annual report that will include:

(1) Identifying problem areas;

(2) Taking corrective action on an ongoing basis;

(3) Preparing an annual report of its findings and corrective actions for each facility, as well as the agency as a whole;

(4) Including an assessment of the agency's progress in addressing sexual abuse by comparing the current year's data and corrective actions with those from prior years.

(5) Ensuring the agency's report shall be approved by the agency head and made readily available to the public through its website; and

(6) Redacting specific material from the reports when publication would present a clear and specific threat to the safety and security of a facility and indicating the nature of the material redacted.

i. The incident-based data collected shall include, at a minimum, the data necessary to answer all questions from the most recent version of the Survey of Sexual Violence conducted by the Department of Justice. Upon request, the Agency PREA Coordinator shall provide all such data from the previous calendar year to the Department of Justice no later than June 30 or by the date requested.

3. Ensure that audits include inspection for areas and situations where sexual abuse may be likely to occur and recommend mitigation for those areas and situations.

4. Collect and compile data and coordinate surveys to ensure continuity of services, operational improvements, and establishment of baselines.

**K. POLICY CLARIFICATION**

All employees, contractors and volunteers of the Department of Corrections shall sign the PREA Acknowledgement Statement.

As required by the Prison Rape Elimination Act, the Department of Corrections shall conduct criminal background records checks at least every five years of permanent, temporary employees and contractors, volunteers, and interns.

## IV. IMPLEMENTATION

This policy will be adopted immediately without further modification. DOC institutions may develop an institution-specific procedure to implement this policy.

Certified: signature on file
Julie Vaughn, Rules Coordinator

Approved: signature on file
Heidi Steward, Deputy Director

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7), Federal Rules of Appellate Procedure, I certify that the Appellants' Opening Brief is proportionately spaced, has a typeface of 14 points or more and contains 7,236 words.

DATED: August 10, 2026

/s/ Ariel T. Ashtamker

ARIEL T. ASHTAMKER #260068
Assistant Attorney General
ariel.ashtamker@doj.oregon.gov

Attorney for Defendants-Appellants
Mike Reese, Ryan LeGore, Jeremy Wagner, Mark Nooth, Erin Reyes, and State of Oregon

DAN RAYFIELD #064790
Attorney General
PAUL L. SMITH #001870
Solicitor General
ROBERT A. KOCH #072004
Attorney-in-Charge,
Civil & Administrative Appeals
ARIEL T. ASHTAMKER #260068
Assistant Attorney General
1162 Court St.
Salem, Oregon 97301
Telephone: (503) 378-4402

Counsel for Appellants

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| S.D. and J.F., individually and on behalf of all others similarly situated,<br><br>Plaintiffs-Appellees,<br><br>v.<br><br>MIKE REESE, et al.,<br><br>Defendants-Appellants,<br><br>JOHN DOES, 1-5,<br><br>Defendants. | U.S.C.A. No. 26-4872<br><br>STATEMENT OF RELATED CASES |

Pursuant to Rule 28-2.6, Circuit Rules of the United States Court of Appeals for the Ninth Circuit, the undersigned, counsel of record for

/ / /

/ / /

/ / /

/ / /

Appellants, certifies that she has no knowledge of any related cases pending in this court.

Respectfully submitted,

DAN RAYFIELD #064790
Attorney General
PAUL L. SMITH #001870
Solicitor General
ROBERT A. KOCH #072004
Attorney-in-Charge,
Civil & Administrative Appeals

/s/ Ariel T. Ashtamker

ARIEL T. ASHTAMKER #260068
Assistant Attorney General
ariel.ashtamker@doj.oregon.gov

Attorneys for Defendants-Appellants
Mike Reese, Ryan LeGore, Jeremy
Wagner, Mark Nooth, Erin Reyes, and
State of Oregon

## CERTIFICATE OF SERVICE

I hereby certify that on August 10, 2026, I directed the Appellants' Opening Brief to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Ariel T. Ashtamker
ARIEL T. ASHTAMKER #260068
Assistant Attorney General
ariel.ashtamker@doj.oregon.gov

Attorney for Defendants-Appellants
Mike Reese, Ryan LeGore, Jeremy Wagner, Mark Nooth, Erin Reyes, and State of Oregon