UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

FILED

AUG 20 2026

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| S.D., individually and on behalf of all others similarly situated; J.F.,<br><br>Plaintiffs - Appellees,<br><br>v.<br><br>MIKE REESE; RYAN LEGORE; MARK NOOTH; ERIN REYES; STATE OF OREGON, by and through the Oregon Department of Corrections; JEREMY WAGNER,<br><br>Defendants - Appellants,<br><br>JOHN DOES, 1-5,<br><br>Defendant. | No. 26-4872<br><br>D.C. No. 6:25-cv-01726-CL<br>District of Oregon, Eugene<br><br>ORDER |

Before: COLLINS, VANDYKE, and TUNG, Circuit Judges

The district court here granted a mandatory injunction that required the State of Oregon to "[i]mmediately end the categorical housing of transgender women in men's [prison] facilities" and (among other things) to apply "a presumption of placement consistent with each person's gender identity, absent a documented and articulable security justification." Amended Order on Prelim. Inj., D.Ct. Dkt. 66, at 2. The State asks us to stay that injunction pending the State's appeal. For the reasons discussed below, we grant the stay.

I.

Plaintiffs J.F. and S.D. brought this class action suit against the State of Oregon and several correctional officers (Defendants) alleging violations of the Eighth Amendment (and other causes of action not relevant here) for the officers' purported failure to take reasonable precautions to address Plaintiffs' alleged exposure to a substantial risk of harm while incarcerated in men's prisons. Plaintiffs J.F. and S.D. alleged that they are "transgender women" inmates (male inmates who later identified as women), and they moved, on behalf of a class of "[a]ll current and future transgender women in [Oregon Department of Corrections ('ODOC')] facilities," for a preliminary mandatory injunction. Compl., D.Ct. Dkt. 1, at 35–36.

The district court (Clarke, Magistrate Judge) granted the motion and provisionally certified a class. The district court acknowledged that issuance of a mandatory injunction must clear a high bar—that "the law and the facts *clearly favor* Plaintiffs' position." *S.D. v. Rees*, No. 6:25-CV-01726-CL, 2026 WL 1146591, at *8 (D. Or. Apr. 28, 2026) (emphasis added). The district court concluded that Plaintiffs met that burden with respect to their Eighth Amendment claims and that a mandatory injunction was therefore warranted. *Id*. at *8–11, 13. Defendants filed a motion for reconsideration. *See* Defs.' Mot. for Recons., D.Ct. Dkt. 47. The district court denied reconsideration in part and granted it in part, issuing an amended preliminary injunction that largely tracks Plaintiffs' requests with a few exceptions

not relevant here. *See S.D. v. Rees by & through the Oregon Dep't of Corr.*, No. 6:25-CV-01726-CL, 2026 WL 1960717, at *6 (D. Or. July 7, 2026). The revised mandatory injunction requires that Defendants:

1. Immediately end the categorical housing of transgender women in men's facilities without individualized safety assessments and instead conduct prompt, case-by-case housing and classification reviews for all transgender women in ODOC custody. The starting point for each assessment shall begin with a presumption of placement consistent with each person's gender identity, absent a documented and articulable security jurisdiction. Then, the assessment shall take into consideration the AIC's [adult-in-custody's] preferences, their privacy, access to medical support, programming, support-network, safety, or other individualized reasons for placement in any particular facility.

2. Provide safe, non-punitive housing options for transgender women, including (as appropriate) transfer to CCCF [Coffee Creek Correctional Facility] [the women's facility], voluntary transgender or gender non-conforming housing units within existing facilities, or other protective placements that do not involve involuntary segregation or loss of programming solely because of transgender status.

3. Prohibit housing transgender women with cisgender cellmates known to have a history of sexual or serious physical violence.

4. Ensure that transgender women have access to separate showers or shower schedules that provide reasonable bodily privacy from male prisoners and staff and implement policies to prevent forced exposure of nude bodies to male inmates.

5. Require that unclothed searches of transgender women be conducted by female staff absent extraordinary, documented circumstances and prohibit cross-gender strip searches otherwise.

6. Implement immediate, confidential, and non-retaliatory reporting mechanisms for sexual abuse, harassment, and threats, including effective [Prison Rape Elimination Act] PREA-compliant hotline access and

prompt, good-faith investigations of all such reports with measures to protect reporters from retaliation.

7. Provide interim mental health support, include crisis counseling, for transgender women who report sexual abuse or exhibit suicidality related to unsafe housing or retaliation.

8. An AIC may decline any of these protections with informed, voluntary consent after a meaningful review of options.

Amended Order on Prelim. Inj., D.Ct. Dkt. 66, at 2–3.

Defendants moved in this court to stay the mandatory preliminary injunction pending appeal. On August 1, 2026, we granted a temporary administrative stay. We now grant a stay of the injunction, as well as a stay of all district court proceedings, pending appeal of the injunction.

II.

We assess four factors in determining whether to grant a stay: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 426 (2009) (citation omitted). All these factors support a stay.

A.

Acknowledging that our role at this stage is merely to make a preliminary assessment of the merits pending the full briefing and oral argument that will allow

us to bring our more "considered judgment to bear on the matter," *id*. at 427, we conclude that Defendants have made a strong showing that they are likely to succeed on the merits. Defendants are likely to succeed on the merits if Plaintiffs failed to establish below that "the law and facts *clearly favor*" their request for a "mandatory injunction." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc) ("[Plaintiff]'s burden here is doubly demanding: Because [Plaintiff] seeks a mandatory injunction, [Plaintiff] must establish that the law and facts *clearly favor* [Plaintiff's] position, not simply that [Plaintiff] is likely to succeed.") (emphasis in original); *see also Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994) ("[A] mandatory injunction 'goes well beyond simply maintaining the status quo *pendente lite* [and] is particularly disfavored.'" (emphasis and alteration in original)).

For several independent reasons, Defendants are likely to succeed on their contentions that the law and the facts do *not* clearly favor the mandatory injunction issued here. *First*, the injunction was likely based on a flawed premise that Defendants employed a "default presumption" of placing Plaintiffs (and class members) in men's prisons. *Second*, even assuming such a default presumption existed, the record likely does not support the district court's conclusion that the presumption produced a substantial risk of harm that Defendants were deliberately indifferent toward. *Third*, the injunction ordered class-wide relief that was based on

what is likely an improperly certified class. *Finally*, the terms of the injunction likely violated the Prison Litigation Reform Act. We address each point in turn.

1.

The district court based the issuance of its mandatory injunction on the following premise: that Defendants did not conduct "individualized assessments" but rather applied a "default presumption" that placed Plaintiffs in men's prisons. *S.D.*, 2026 WL 1146591, at *1, *10. But Defendants have made a strong showing that the premise likely lacks support in the record and is clearly erroneous. Defendants submitted declarations explaining in detail the process they employed in deciding where to place "transgender" inmates. Newly admitted inmates who claim "transgender, nonbinary, genderfluid, or intersex" status are "placed in the infirmary until" a committee "can gather all necessary information to decide placement," which takes about a week. Jones Decl., D,Ct. Dkt. 27, ¶ 4. Inmates already in custody but who later "come forward to identify as transgender, nonbinary, genderfluid, or intersex remain in their current facility until [the committee] reviews and makes a placement decision." *Id.* "When determining appropriate and safe housing, committee members will consider: the AIC's [adult-in-custody's] medical history; the AIC's mental health status; how the AIC self-identifies; the safety of the AIC, other AICs, and staff; observation of the AIC's behaviors; and any other

relevant information. Each housing placement is individualized and determined on a case-by-case basis." *Id.* at ¶ 3.d.

Defendants' records, which are not seriously disputed, also support the conclusion that Defendants did not employ a default presumption. Defendants stated that "[t]here are currently 117 transgender AICs housed in ODOC prisoners, 26 of the 117 have requested to be housed at [the women's prison], and 8 are currently housed" there. *Id*. at ¶ 6. "Not all transgender female AICs" (male inmates identifying as women) "want to be housed at [the women's prison]," Defendants represented. *Id*. at ¶ 8. "Some transgender female AICs specifically request placement at men's facilities, for a variety of reasons, and may be granted such placement when it is appropriate." *Id*. "Based upon our current tracking information," Defendants said, "approximately 22 transgender women total have been housed at CCCF." *Id*. at ¶ 7.

Placement decisions also show that the district court likely clearly erred in finding that Defendants applied a default presumption. The placement of the only named Plaintiff (J.F.) who remains in custody is illustrative.[1] Plaintiff J.F. entered the Department's custody in 2008 and first identified "as transgender" in 2015. Jones Decl., D.Ct. Dkt. 27, ¶ 10. J.F. requested transfer to a women's prison in 2021

[1] The other named Plaintiff (S.D.) is no longer in custody. *See S.D.*, 2026 WL 1146591, at *4 n.1

but was "not eligible to transfer" "due to safety concerns of the [female inmates]" at the women's prison. *Id*. J.F. was "incarcerated for a sex offense against a disabled female victim who was in the care of [J.F.'s] mother; the victim had physical limitations and was unable to communicate. The victim had to have surgery to remove an 11-inch plastic object that was lodged in her abdomen by J.F., who lodged it into her abdomen via the victim's vagina. The victim's injuries were potentially fatal." *Id*.[2] Plaintiffs do not dispute these facts. On this record, we conclude that Defendants are likely to succeed in contending that the district court clearly erred in concluding that Defendants applied a "default presumption" of placement in men's prisons.

Consideration of the district court's questionable reasoning further confirms this conclusion. The district court inferred a "default presumption" from the mere fact that "more than 90% of transgender women are housed in men's facilities." *S.D.*, 2026 WL 1146591, at *1. But viewed in context, that inference is likely unwarranted. It fails to take into account that only 26 "transgender inmates" (out of

[2] Other inmates were also apparently assessed on an individualized basis. *Id.* ¶ 12 (L.B. sexually abused "a young niece" and "physically assaulted" a "girlfriend by grabbing her throat and pushing her up against a wall"; L.B.'s request was "denied due to [L.B.'s] assaultive history toward women"); *Id.* ¶ 11 ("Jane Doe" was transferred to a women's facility upon request, but returned to a men's facility after displaying "aggressive" behavior toward women (calling them "bitches" and "whores"), grabbing Doe's own "[male] genitals, and requesting a return to a men's facility; Doe returned to the women's prison after receiving a "vulvoplasty").

117) requested transfer, and 8 of them were transferred. The district court admitted to giving "little weight" to the low number of requests, saying it had "no information about the other 91 [inmates], including whether they were aware that requesting a transfer is required, or that it is even an option, to be considered for housing at [the women's facility]." *Id*. at *10. But Plaintiffs bore the burden of showing that those other 91 inmates were placed by default in men's facilities and that they did not know to make a request to be placed in a women's facility. Rather than hold Plaintiffs to their burden, the district court appears to have essentially "substitute[d] [its] assumptions for evidence in the record." *United States v. Barnes*, 895 F.3d 1194, 1199 (9th Cir. 2018).

2.

Even assuming the existence of a default presumption, however, the district court's mandatory injunction would likely still be unjustified. Defendants are likely to succeed in contending that the record here does not support the conclusion that any presumption reflected Defendants' deliberate indifference to a substantial risk of harm to Plaintiffs and other class members—a prerequisite to establishing an Eighth Amendment violation. *See Farmer v. Brennan*, 511 U.S. 825, 828 (1994).

The district court concluded that there was a substantial risk of harm because "[n]early 35% of transgender people in state and federal prisons were sexually assaulted *between 2007 and 2021*, compared to less than 5% of the general prison

population who experienced the same." *S.D.*, 2026 WL 1146591, at *9 (emphasis added). But the Department of Justice study, cited by the district court, was *not* from 2007 through 2021. Rather, the study covered a much narrower timeframe—2007, 2008–2009, and 2011–2012. *See* U.S. Dep't of Justice Office of Justice Programs, *Sexual Victimization in Prisons and Jails Reported by Inmates, 2011–12*, NCJ No. 241399, Supp. Table 1 (2014). The district court's error here is significant: the statistics used long predate the relevant period here—Plaintiff J.F. and other inmates (who submitted declarations) had all requested transfer *during or after* 2021. The district court's use of stale statistics, a decade old, does not justify finding a "substantial risk of harm."

The district court's reliance on the DOJ study is likely flawed in another respect: the DOJ statistics are cumulative *nationwide* numbers reflecting reports at *both federal and state prisons*; the numbers do not necessarily reflect conditions in Oregon prisons, which likely have a different model of prison administration from many other prisons (for instance, the Oregon Department of Corrections has a specific "Transgender and Intersex Committee" that "determine[s] appropriate and safe housing for transgender and intersex adults-in-custody," *see* Jones Decl., Dkt. 27, ¶ 3.a.). The district court, to be sure, relied also on declarations of individuals who claim to be exposed to a substantial risk of harm from sexual assault while in men's prisons. But even if we credited those declarations, individual instances of

harm would warrant, at most, individual redress of particular constitutional violations. They would not justify the class relief mandated by the district court.

3.

The district court's injunction is also likely based on an improperly certified class. The certified class here included "[a]ll current and future transgender women in ODOC custody." *S.D.*, 2026 WL 1146591, at *19. Plaintiffs "must 'affirmatively demonstrate' by a preponderance of the actual evidence that they satisfy all the Rule 23 prerequisites." *Dickinson v. Trump*, 174 F.4th 634, 646 (9th Cir. 2026) (citations omitted). But they likely failed to satisfy that requirement here. *See* Fed. R. Civ. Proc. 23(a) (requiring "questions of law or fact common to the class"). The district court's finding of commonality rested on its conclusion that Defendants had a "systemic" policy that "preferences housing [proposed class members], categorically, in men's prisons, such that they are exposed to a substantial risk of violence and sexual assault." *S.D.*, 2026 WL 1146591, at *17. But as discussed, Defendants are likely to succeed in their arguments that the record does not support the existence of such a policy. *See supra* II.A.1.

The provisional class certification is likely to be vacated for a separate reason. "The district court's class certification ruling depended on, and was in service of, its preliminary injunction." *Fraihat v. U.S. Immigration and Customs Enforcement*, 16 F.4th 613, 635 (9th Cir. 2021). Thus, "[i]f the preliminary injunction is infirm, the

class certification order necessarily falls as well, regardless of whether class certification was otherwise proper under Federal Rule of Civil Procedure 23." *Id.* Because the preliminary injunction is likely "infirm" (*see supra* II.A.1–2), the class certification would also fail aside from its deficiencies under Rule 23.

4.

The district court's mandatory injunction also likely violates the Prison Litigation Reform Act. The Act requires that any preliminary injunctive relief "be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm." 18 U.S.C. § 3626(a)(2). The district court's injunction likely fails these requirements. To start, it does not appear "narrowly drawn." The injunction effects an overhaul of Oregon's prison administration by imposing a "presumption of placement consistent with each person's gender identity" with respect to more than a hundred "transgender" inmates—on top of additional micromanagement regarding searches, shower schedules, and the implementation of reporting mechanisms such as a "hotline access." Amended Order on Prelim. Inj., D.Ct. Dkt. 66, at 2–3. These measures are likely more "than necessary to correct the harm the court [found] require[d] preliminary relief." 18 U.S.C. § 3626(a)(2). The district court's injunction appears likely to exceed "the least intrusive means necessary to correct [the] harm." *Id.* Moreover, the injunction is ambiguous in several respects requiring

it to be set aside: it does not explain what "*serious*" physical violence means (Amended Order on Prelim. Inj., D.Ct. Dkt. 66, at 2); what it means to "provide *reasonable* bodily privacy" (*id.*); when a circumstance is "extraordinary" to excuse female staff from conducting searches of "transgender" inmates (*id*. at 3); and what it means when the injunction permits inmates to decline protections "with informed, voluntary consent after a *meaningful* review of options." (*id*. at 3).[3]

B.

The remaining factors support a stay. "[I]t is difficult to imagine an activity in which a State has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures, than the administration of its prison." *Woodford v. Ngo*, 548 U.S. 81, 94 (2006) (citations and internal quotation marks omitted). But the district court's injunction substantially disrupts the State's

[3] The district court also likely failed to give "substantial weight" as required by the Act "to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief." 18 U.S.C. § 3626(a)(2). Defendants explained why Plaintiff J.F.—who has been incarcerated for a sex offense that involved lodging a footlong plastic object through a female victim's vagina (Jones Decl., Dkt. 27, ¶ 10)—should not be transferred to a women's prison. They further explained that their "objective screening process" (applied to J.F. and other "transgender" inmates) did not warrant Plaintiffs' proposed presumption of placing such inmates in a women's prison. Yet the district court mandated that presumption. To be sure, the presumption could be rebutted by "a documented and articulable security justification" (Amended Order on Prelim. Inj., D.Ct. Dkt. 66, at 2), but the district court apparently believed that, in J.F.'s case, no such justification existed. Remarkably, the district court stated that "no explanation has been provided as to why J.F.'s violent history requires [J.F.'s] continued housing in a men's prison." *S.D.*, 2026 WL 1146591, at *12.

management of its own prison system, with attendant potential safety risks to women inmates in the only state-run women's prison in Oregon. That works an irreparable injury to Defendants, risks substantial injury to other interested parties, and compromises the public interest. We grant a stay of the preliminary injunction.

III.

We also grant a stay of the district court proceedings pending appeal. The district court has already ordered Defendants to produce information relating to the members of the class that it certified. *See* D.Ct. Dkt. 69. But because Plaintiffs "are unlikely to succeed" on the merits and it is thus likely that "the provisional class was improperly granted," *Dickinson*, 174 F.4th at 650, such discovery is not warranted, and we therefore stay the district court proceedings pending appeal.

**DEFENDANTS' MOTION IS GRANTED.**