No. 26-4872

IN THE UNITED STATES CIRCUIT COURT OF APPEALS
FOR THE NINTH CIRCUIT

S.D. and J.F.,
individually and on behalf of all others similarly situated,
Plaintiffs-Appellees,

v.

MIKE REESE, et al.,
Defendants-Appellants.

JOHN DOES, 1-5,
Defendants.

# APPELLANT'S OPENING BRIEF

Appeal from the United States District Court
for the District of Oregon, Eugene Division
Case No. 6:25-cv-01726-CL
The Honorable Judge Mark D. Clark

John Burgess, OSB No. 106498
johnburgess@civilrightsoregon.com
Carl Post, OSB No. 061058
carlpost@civilrightsoregon.com
POST BURGESS
3835 NE Hancock St., Ste. 102
Portland, OR 97212
Telephone: (971) 442-9303

## TABLE OF CONTENTS

INTRODUCTION ..... 1

STATEMENT OF JURISDICTION ..... 3

STATEMENT OF THE ISSUES ..... 4

STATEMENT OF THE CASE ..... 5

A. ODOC's written policies require individual review, but most transgender women begin that review while already housed in men's facilities. ..... 5

B. Plaintiffs presented evidence of known dangers, serious violence, and ineffective protection. ..... 6

1. ODOC housed transgender women with prisoners known to be dangerous and left them there after being warned ..... 7

2. Reporting produced disclosure and retaliation rather than protection. ..... 8

3. Transgender women were exposed to male prisoners and staff during showers, cell checks, and searches. ..... 9

4. Segregation and self-harm became the practical alternatives to unsafe housing. ..... 10

C. Defendants relied primarily on high-level policies and generalized declarations from ODOC officials. ..... 11

D. The district court applied the heightened standard and entered an amended injunction preserving ODOC's placement authority. ..... 12

SUMMARY OF ARGUMENT ..... 14

STANDARD OF REVIEW ..... 17

ARGUMENT ..... 18

I. THE RECORD SUPPORTS THE FINDINGS THAT ODOC KNEW OF A SUBSTANTIAL RISK OF RAPE AND

SERIOUS VIOLENCE AND DID NOT REASONABLY RESPOND. ....18

A. Plaintiffs assert a right to reasonable safety, not a right to CCCF. ....18

B. The record supports the finding of a substantial risk of serious harm. ....19

C. ODOC's policies, its committee, and specific warnings establish actual knowledge. ....21

D. The district court found that ODOC's response was inadequate. ....22

E. Individual review is relevant, but not constitutionally sufficient. ....23

F. The amended injunction requires a constitutionally adequate review while preserving ODOC's discretion. ....24

II. ODOC'S OWN DATA AND ITS OWN DESCRIPTION OF ITS PROCESS MADE THE BASELINE FINDING A PERMISSIBLE INFERENCE. ....25

A. Individual assessments and an operative baseline are not mutually exclusive. ....25

B. ODOC's placement figures corroborated that baseline. ....26

C. The court did not rely on the placement figures alone. ....29

D. Failure to request CCCF is not an affirmative preference for existing housing. ....31

E. Individual reasons for denying CCCF do not establish that the alternative was safe. ....32

F. The Eighth Amendment inquiry does not turn on how ODOC characterizes its process. ....32

III. THE DISTRICT COURT WEIGHED THE EVIDENCE; IT DID NOT SHIFT THE BURDEN OF PROOF. ....33

A. The district court never placed the burden on Defendants. ......33

B. Plaintiffs presented evidence supporting each material finding. ......34

C. The court's discussion of evidence Defendants could have produced concerned weight, not burden. ......34

D. Defendants' evidence was considered, but it did not compel their preferred result. ......35

IV. EACH *WINTER* FACTOR FAVORS PLAINTIFFS......36

A. Plaintiffs established a strong likelihood of success on their Eighth Amendment claim. ......36

B. The threatened harms are irreparable. ......36

C. The equities and public interest favor protection. ......37

V. THE DISTRICT COURT APPLIED THE HEIGHTENED STANDARD, AND ITS FINDINGS ARE REVIEWED ONLY FOR CLEAR ERROR. ......39

A. The orders expressly apply the heightened standard and find it satisfied. ......39

B. The mandatory nature of the injunction does not permit de novo reweighing of the record. ......40

VI. THE AMENDED INJUNCTION STATES ITS TERMS SPECIFICALLY AND SATISFIES RULE 65. ......41

A. Rule 65 requires reasonable detail, not a line-by-line operating manual. ......41

B. The operative amended order, not the superseded language, defines Defendants' obligations. ......45

C. The housing provisions are tied directly to the dangers found by the court. ......46

D. The privacy and search provisions respond to specific record evidence. ....47

E. The reporting, retaliation, and mental health provisions are also tied to the record. ....48

VII. THE RELIEF IS NARROWLY DRAWN AND NO MORE INTRUSIVE THAN THE PLRA ALLOWS. ....50

A. The district court applied the correct standard and tied the relief to the harm it found. ....50

B. The decisions Defendants cite rejected the micromanagement objection they now raise. ....52

VIII. PROVISIONAL CERTIFICATION WAS PROPER BECAUSE THE CLASS CHALLENGES A COMMON PRACTICE AND SEEKS A COMMON PROCESS. ....54

CONCLUSION ....57

CERTIFICATE OF COMPLIANCE ....59

CERTIFICATE OF SERVICE ....60

# TABLE OF AUTHORITIES

## Cases

*A&M Records, Inc. v. Napster, Inc.*,
284 F.3d 1091 (9th Cir. 2002) ....................43
*Anderson v. City of Bessemer City*,
470 U.S. 564 (1985).................... 17, 28
*Arc of Cal. v. Douglas*,
757 F.3d 975 (9th Cir. 2014) ....................26
*Armstrong v. Brown,*
768 F.3d 975 (9th Cir. 2014) ....................52
*Bateman v. U.S. Postal Serv.*,
231 F.3d 1220 (9th Cir. 2000) ....................42
*Bell v. Wolfish*,
441 U.S. 520 (1979)....................53
*BNSF Ry. Co. v. County of Alameda*,
7 F.4th 874 (9th Cir. 2021) ....................17
*Coca-Cola Co. v. Overland, Inc.*,
692 F.2d 1250 (9th Cir. 1982) ....................42
*Cunningham v. Gates*,
229 F.3d 1271 (9th Cir. 2000) ....................3
*Diaz v. Am. Tel. & Tel. Co.*,
752 F.2d 1356 (9th Cir. 1985) ....................27
*Doe v. Trump*,
Case No. 25-5099, Doc. 2124152 (D.C. Cir. July 7, 2025) ....................20
*E. & J. Gallo Winery v. Gallo Cattle Co.*,
967 F.2d 1280 (9th Cir. 1992) ....................43
*Farmer v. Brennan*,
511 U.S. 825 (1994).................... 18, 19, 22, 23, 33
*Fortyune v. Am. Multi-Cinema, Inc.*,
364 F.3d 1075 (9th Cir. 2004) ....................43
*Fraihat v. U.S. Immigr. & Customs Enf't*,
16 F.4th 613 (9th Cir. 2021) ....................54
*Garcia v. Google, Inc.*,
786 F.3d 733 (9th Cir. 2015) ....................18
*Helling v. McKinney*,
509 U.S. 25 (1993)....................19
*Indep. Living Ctr. of S. Cal., Inc. v. Shewry*,
543 F.3d 1050 (9th Cir. 2008) ....................17

*Jordan v. Gardner*,
986 F.2d 1521 (9th Cir. 1993) ....................48
*Lamb-Weston, Inc. v. McCain Foods, Ltd.*,
941 F.2d 970 (9th Cir. 1991) ....................41
*Martinez-Serrano v. INS*,
94 F.3d 1256 (9th Cir. 1996) ....................3
*Martinez-Serrano v. INS*,
94 F.3d 1256 (9th Cir. 1996) ....................3
*Melendres v. Arpaio*,
695 F.3d 990 (9th Cir. 2012) ....................3, 4
*Melendres v. Skinner*,
113 F.4th 1126 (9th Cir. 2024) ....................41
*Mohawk Indus., Inc. v. Carpenter*,
558 U.S. 100 (2009)....................3
*Monroe v. Bowman*,
No. 3:18-CV-00156-NJR, 2025 WL 3267798 (S.D. Ill. Nov. 24, 2025)....................47
*Obrey v. Johnson*,
400 F.3d 691 (9th Cir. 2005) ....................28
*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
31 F.4th 651 (9th Cir. 2022) ....................18
*Olim v. Wakinekona*,
461 U.S. 238 (1983)....................19
*Paige v. Cal.*,
102 F.3d 1035 (9th Cir. 1996) ....................4
*Parsons v. Ryan*,
754 F.3d 657 (9th Cir. 2014) ....................37
*Porretti v. Dzurenda*,
11 F.4th 1037 (9th Cir. 2021) ....................38
*Puente Ariz. v. Arpaio*,
821 F.3d 1098 (9th Cir. 2016) ....................17
*Roman v. Wolf*,
977 F.3d 935 (9th Cir. 2020) ....................57
*Rosas v. Baca*,
No. CV 12-00428 DDP SHX, 2012 WL 2061694 (C.D. Cal. June 7, 2012)....................57
*San Luis Obispo Coastkeeper v. County of San Luis Obispo*,
161 F.4th 590 (9th Cir. 2025) ....................40
*Schmidt v. Lessard*,
414 U.S. 473 (1974)....................43
*United States v. Hinkson*,
585 F.3d 1247 (9th Cir. 2009) (en banc) ....................28

*United States v. Ironworkers Local 86*,
443 F.2d 544 (9th Cir. 1971) ....................................................................27
*United States v. V-1 Oil Co.*,
63 F.3d 909 (9th Cir. 1995) ......................................................................43
*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011)....................................................................................55
*Zombie v. State of Oregon,*
No. 3:21-cv-01338-AA (D. Or. Sept. 8, 2023)..............................................36

**Statutes**

18 U.S.C. § 3626 ...........................................................................................47
28 C.F.R. § 115.42 .........................................................................................45

## INTRODUCTION

The district court found that Plaintiffs-Appellees—transgender women in Oregon Department of Corrections ("ODOC") custody—face a known, substantial risk of rape and serious physical violence, and that ODOC's existing practices do not reasonably address it. In reaching that conclusion, the court relied on sworn, firsthand declarations, ODOC's own policies and placement data, and declarations from ODOC officials. The district court's finding is reviewed for abuse of discretion.

Defendants-Appellants' brief does not engage with the district court's findings. It does not dispute that the risk of sexual assault in prison for transgender individuals is much higher than non-transgender individuals. The brief does not address the declarations describing numerous rapes and physical assaults, which occurred despite clear warnings and requests for protection. Defendants instead claim that ODOC already "provide[s] safe, non-punitive housing options for transgender women." Opening Br. 27. But the district court found that claim conclusory, attested to by "high-level ODOC staff with no personal or first-hand knowledge of the situations at issue," and unsupported by the record. 1-ER-42.

Defendants rest their appeal on one asserted factual error: their claim that the district court wrongly found that ODOC's process operates from a baseline of placement in men's facilities. They refer to this as the "foundational finding," and

insist that "no evidence" supports it. Opening Br. 14. But of the transgender women in ODOC custody, all but eight (approximately 94%) were housed in men's prisons, and the court reasonably relied on other evidence to support its findings. Defendants' own policies and arguments provide evidence that ODOC operates from a baseline of housing transgender women in men's prisons and are aware of the risk of harm that creates. The inferences the court drew from the evidence was permissible, and disagreement with it does not demonstrate clear error.

ODOC's assessment process fails to answer the constitutional question. The district court did not find that ODOC does not conduct any assessments. It found that ODOC's default housing placement of transgender women in men's prisons creates a substantial risk of serious harm. An assessment is not a substitute for a reasonable response.

The relief entered reflects that distinction. It mandates no placement for any prisoner and leaves every final housing decision to ODOC. ODOC may depart from the starting presumption for a documented and articulable security reason, must consider the prisoner's preferences and circumstances, and may honor her choice to decline any protection. The remaining terms track harms in the record and duties ODOC says it already performs. Requiring that those protections

operate in fact is not micromanagement. Provisional certification rests on the same record: the class challenges common practices and a common exposure to risk.

The amended preliminary injunction and the provisional class certification should be affirmed.

## STATEMENT OF JURISDICTION

Plaintiffs agree with Defendants' jurisdictional statement.[1] The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1343 because Plaintiffs asserted claims under 42 U.S.C. § 1983 and the United States Constitution. This Court has jurisdiction to review the preliminary injunction under 28 U.S.C. § 1292(a)(1).

Because the preliminary injunction provides class-wide relief, this Court may also review the provisional class certification to the extent necessary for

[1] Appellants' statement of the case describes a July 24, 2026 order directing production of discovery identifying transgender inmates in ODOC custody. Opening Br. 8–9. That order is not before this Court. Appellants assign no error to it: it appears in neither issue presented, no argument addresses it, and the conclusion asks only that this Court vacate the preliminary injunction and class certification orders. *Id.* at 3–4, 34. Any challenge to it is therefore waived. *Martinez-Serrano v. INS*, 94 F.3d 1256, 1259 (9th Cir. 1996) (an issue "referred to in the appellant's statement of the case but not discussed in the body of the opening brief is deemed waived"). Moreover, a discovery order is not an appealable interlocutory order, *see Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 108 (2009), and this Court's jurisdiction under 28 U.S.C. § 1292(a)(1) reaches an otherwise non-appealable ruling only where it is "inextricably intertwined with or necessary to ensure meaningful review of the order properly before us." *Melendres v. Arpaio*, 695 F.3d 990, 996 (9th Cir. 2012) ("*Melendres I*"). Review of the discovery order is not intertwined with this appeal because it is not necessary to resolve the issues on appeal and the standards are different. *Cunningham v. Gates*, 229 F.3d 1271, 1284–85 (9th Cir. 2000).

effective review of the injunction. *Melendres I*, 695 F.3d at 999; *Paige v. California*, 102 F.3d 1035, 1039 (9th Cir. 1996).

## STATEMENT OF THE ISSUES

1. Whether the district court abused its discretion in granting mandatory preliminary relief after finding, based on sworn and largely unrebutted evidence, that transgender women in ODOC custody face a substantial risk of rape and serious violence.
2. Whether the district court clearly erred in finding that ODOC's housing process starts from placement in men's prisons, when ODOC's own data showed that outcome for all but eight of 123 transgender women.
3. Whether the district court shifted the burden of proof by weighing Defendants' evidence only after finding that Plaintiffs had carried their own.
4. Whether an injunction that mandates no particular placement, preserves a documented security exception, and leaves implementation to ODOC violates Rule 65 or the Prison Litigation Reform Act.
5. Whether the district court abused its discretion in provisionally certifying a class of transgender women who face the same risk under the same ODOC housing and safety practices.

## STATEMENT OF THE CASE

### A. ODOC's written policies require individual review, but most transgender women begin that review while already housed in men's facilities.

ODOC's written policies recognize that transgender status is relevant to vulnerability and safety. Its Prison Rape Elimination Act ("PREA") policy requires an initial screening and considers whether a prisoner is transgender. Add-6. The policy also requires case specific consideration of whether a placement will protect the prisoner's health and safety without creating security or management problems. Add-7. A transgender prisoner's own views concerning safety must receive serious consideration. *Id.*

ODOC uses the Transgender and Intersex Committee ("TAIC") to consider housing and other issues involving transgender prisoners. 2-ER-239–40. According to Greg Jones, TAIC's chair, a new prisoner who identifies as transgender at intake may remain in the intake infirmary while TAIC gathers information. 2-ER-240. A prisoner who identifies as transgender after assignment to an institution remains at the current facility while TAIC reviews the case and decides whether to alter the placement. *Id.*

Defendants' data showed that most transgender women identified as transgender after an initial assignment in a men's facility. 2-ER-147–48. Of the 83 transgender women who had not requested placement at Coffee Creek Correctional

Facility ("CCCF"), the only women's facility in Oregon, 59 identified as transgender only after receiving an assignment to a men's facility. 2-ER-148. The sixteen additional transgender women who ultimately requested to be housed at CCCF also identified as transgender after their initial assignment. *Id*. Thus, for most members of the class, the process begins with continued placement in a men's facility unless TAIC affirmatively decides to move them.

ODOC initially identified 117 transgender women in its custody. Only eight were housed at CCCF. 2-ER-240. Their subsequent supplemental declaration identified 123 known transgender women, with the same eight housed at CCCF. 2-ER-147. Defendants concede that ODOC does not currently maintain a voluntary transgender or gender nonconforming housing unit within another ODOC institution. 2-ER-116 ("The practice of creating LGBT-only housing units is not … utilized by ODOC [.]").

### B. Plaintiffs presented evidence of known dangers, serious violence, and ineffective protection.

Plaintiffs supported their motion with declarations from J.F. and three other transgender women housed in ODOC institutions. 2-ER-287–307. Each has been designated by ODOC as vulnerable or potentially vulnerable and three of the four remain in men's prisons. 2-ER-297, 301, 304. Their accounts are not claims that any declarant is entitled to a particular facility. They are evidence of what

happened to transgender women in general population men's prisons, and of how ODOC responded. The declarations describe four recurring failures.

**1. ODOC housed transgender women with prisoners known to be dangerous and left them there after being warned.**

J.F. was placed in a cell with a gang member over her objection. Both she and the other prisoner told an officer the placement was unsafe; staff answered that the only alternative was segregation. The cellmate later raped her. At SRCI she was housed with a known sexual predator who harassed her and demanded sex; she reported him, no investigation followed, and she remained in the cell. 2-ER-305. An SRCI officer coerced J.F. and another transgender woman, S.D., into sexual acts and recorded them on his personal cellphone. *Id.*

Jane Doe was housed for more than a year with a sexually violent offender who told her he had been sent to segregation for PREA violations involving another transgender woman. He repeatedly assaulted her and forced her into a coerced "relationship." 2-ER-289. Later, a different cellmate repeatedly harassed, assaulted, and raped her over a three-week period. When she asked an officer to move her, she was pressed for "specifics" she was afraid to give, and the officer returned her to the same cell, where she was assaulted again. 2-ER-290–91. After ODOC released her from segregation, it assigned her to live with another known violent sex offender, who immediately began harassing her. 2-ER-290.

S.S. told ODOC and OSP staff that housing her with a particular prisoner would put her at risk. Staff made no protective change and left her in the cell. He sexually assaulted her on or about September 3, 2023. 2-ER-301. L.B. was physically assaulted and groped by a cellmate and ODOC kept her housed with him for months. 2-ER-297.

### 2. Reporting produced disclosure and retaliation rather than protection.

TRCI staff repeatedly disclosed J.F.'s PREA reports to the very prisoners she reported. After she complained about a gang member, staff told him she had reported him; he later assaulted her. 2-ER-304. Another her cellmate attacked her and fractured her orbital socket, ODOC punished her for the incident, labeled her the aggressor, and dismissed her report as false. 2-ER-304. When she reported a staff member for sexual misconduct, the investigator told the staff member about the report she J.F. was transferred. 2-ER-305. When J.F. reported an inmate for groping her, the PREA captain required an "apology" but imposed no discipline; the inmate then confronted her and demanded she withdraw the complaint. 2-ER-306.

Doe twice tried to report her cellmate's assaults to the PREA Compliance Manager, who told her that her only alternative was an open cell on mainline and that she would "get over it." No formal investigation began until she filed a tort claim, and her assailant was permitted to leave segregation for work while other

prisoners threatened her as a “snitch.” 2-ER-289. When she did report a rape, staff told her to change clothes and walk to Security rather than preserving evidence; she waited hours for a forensic exam, undressed in front of male staff, and recounted the assault repeatedly while asking to go to a hospital. Her attacker remained in the same institution for roughly eight months. 2-ER-291–92. ODOC also placed Doe in an active gang unit where gangs enforced a "policy" barring transgender prisoners from the phones. 2-ER-290. S.S. was retaliated against for reporting a sexual assault by being left in the same unit as her attacker and denied required medical and psychological services. 2-ER-301–02.

#### 3. Transgender women were exposed to male prisoners and staff during showers, cell checks, and searches.

J.F.’s current housing has large windows and offers no meaningful privacy. 2-ER-306. Staff open the door without warning while she uses the toilet or changes clothes. *Id.* The showers lack privacy screens, allowing men to watch her undress and bathe. *Id.* Male officers repeatedly strip-searched Doe in view of male prisoners and staff, while making comments about her genitals. 2-ER-288. Her segregation cell faced the lines for showers, tablets, and phones, leaving groups of men outside her door. 2-ER-292. L.B. disclosed to TAIC that she could not shower or change clothes without being watched by male prisoners. 2-ER-298.

#### 4. Segregation and self-harm became the practical alternatives to unsafe housing.

When staff told J.F. she would be moved to a unit where she was "likely to be assaulted," she attempted suicide. 2-ER-305. She has spent long periods in solitary confinement trying to protect herself, and at times deliberately provoked altercations so that she would be sent to segregation, which she saw as her only escape from ongoing sexual abuse. 2-ER-304, 306. L.B. engaged in self-harm after being celled with a man she had previously reported. 2-ER-298.

The district court reviewed these accounts in detail. 1-ER-20–30. It also noted that

> Defendants have not disputed the general contention that transgender women face a significantly higher-than-average likelihood of violence and sexual assault by cisgender male inmates in men's prisons. Nearly 35% of transgender people in state and federal prisons were sexually assaulted between 2007 and 2021, compared to less than 5% of the general prison population who experienced the same.

1-ER-31 (citing U.S. DEP'T OF JUSTICE OFF. OF JUSTICE PROGRAMS, Sexual Victimization in Prisons and Jails Reported by Inmates, 2011-12, NCJ No. 241399, Supplemental Table I (2013)). That evidence was relevant to the nature and obviousness of the danger. The first-hand accounts, in the form of declarations, showed that the danger had repeatedly materialized in ODOC custody and that officials were aware of the dangers transgender women face in ODOC custody.

### C. Defendants relied primarily on high-level policies and generalized declarations from ODOC officials.

Defendants opposed preliminary relief with declarations from Greg Jones, Ericka Sage, and Dawnell Meyer. 2-ER-229–43. Jones described TAIC and ODOC's individual review process. 2-ER-238–43. He also provided reasons why J.F. and some declarants were not placed at CCCF. *Id.* Sage summarized the formal disposition of some PREA allegations and described ODOC's reporting and investigation policies. 2-ER-232–37. Meyer provided limited information concerning surgery status and CCCF placements. 2-ER-229–31.

The district court considered this evidence. In Sage's declaration, the district court found that she restated policy without explaining whether the policies had been followed in the incidents described by Plaintiffs. 1-ER-7–9. In addition, the court found that the declaration's use of the terms "unsubstantiated" and "unfounded" did not provide enough information to evaluate the investigations, the specific incidents omitted from Sage's summary, or the effect of those incidents on housing decisions. 1-ER-8–9.

The court also considered Jones's statement that some transgender women prefer placement in men's facilities and found the statement less persuasive because it included no concrete information about the number of transgender women with those preferences or any details on the circumstances of those preferences. 1-ER-9–10. The court did not hold that ODOC was required to

disclose identities publicly but determined ODOC could have submitted anonymous examples or nonidentifying information, as Plaintiffs had done. *Id.*

The court expressly clarified that it had not found that ODOC never conducts individual housing assessments. 1-ER-10. Instead, the finding concerned the operational and safety consequences of the process itself, not a complete absence of administrative review.

### D. The district court applied the heightened standard and entered an amended injunction preserving ODOC's placement authority.

The district court recognized that Plaintiffs sought mandatory preliminary relief and therefore had to show that the law and facts clearly favored their position. 1-ER-18–19, 30. It found that Plaintiffs satisfied that standard on their Eighth Amendment claim. 1-ER-30–35.[2]

The court provisionally certified a class of current and future transgender women in ODOC custody. 1-ER-47–53. It found that the class challenged common housing and safety practices and sought a common remedy, even though the proper placement for each member could differ. *Id.*

Defendants moved for reconsideration. The court again stated that Plaintiffs had carried their burden for both provisional certification and a mandatory

[2] The district court found that Appellees had established a likelihood of success on the merits of their Equal Protection claim but did not hold that they had met the more stringent standard applicable to mandatory injunctions.

preliminary injunction. 1-ER-6. The court's order explained its assessment of the State's declarations, rejected Defendants' burden-shifting argument, and reaffirmed its Eighth Amendment findings. 1-ER-7–13.

The court amended the injunction to remove any suggestion that the initial presumption dictates a final placement. The operative order requires ODOC to:

> 1. Immediately end the categorical housing of transgender women in men's facilities without individualized safety assessments and instead conduct prompt, case-by-case housing and classification reviews for all transgender women in ODOC custody. The starting point for each assessment shall begin with a presumption of placement consistent with each person's gender identity, absent a documented and articulable security justification. Then, the assessment shall take into consideration the [inmate]'s preferences, their privacy, access to medical support, programming, support-network, safety, or other individualized reasons for placement in any particular facility.
>
> 2. Provide safe, non-punitive housing options for transgender women, including (as appropriate) transfer to CCCF, voluntary transgender or gender non-conforming housing units within existing facilities, or other protective placements that do not involve involuntary segregation or loss of programming solely because of transgender status.
>
> 3. Prohibit housing transgender women with cisgender cellmates known to have a history of sexual or serious physical violence.
>
> 4. Ensure that transgender women have access to separate showers or shower schedules that provide

reasonable bodily privacy from male prisoners and staff and implement policies to prevent forced exposure of nude bodies to male inmates.

5. Require that unclothed searches of transgender women be conducted by female staff absent extraordinary, documented circumstances and prohibit cross-gender strip searches otherwise.

6. Implement immediate, confidential, and non-retaliatory reporting mechanisms for sexual abuse, harassment, and threats, including effective PREA-compliant hotline access and prompt, good-faith investigations of all such reports with measures to protect reporters from retaliation.

7. Provide interim mental health support, including crisis counseling, for transgender women who report sexual abuse or exhibit suicidality related to unsafe housing or retaliation.

8. An [inmate] may decline any of these protections with informed, voluntary consent after a meaningful review of options.

1-ER-3–4.

The reconsideration order explained that the starting presumption "does not dictate an outcome for any individual [inmate]." 1-ER-14. In other words, ODOC remains responsible for every final placement decision.

## SUMMARY OF ARGUMENT

Defendants ask this Court to reweigh the preliminary injunction record. Clear error review does not permit that.

First, the district court's Eighth Amendment findings rest on the record. Plaintiffs submitted sworn firsthand accounts of rape and serious violence, of warnings staff received before the assaults that followed, and of reports that brought retaliation instead of protection. ODOC's own policies treat transgender status as bearing on vulnerability, and Defendants never disputed that transgender prisoners are sexually assaulted at many times the rate of other prisoners. On that record, the court correctly found a substantial risk of serious harm, Defendants' actual knowledge of the risk, and an unreasonable response marked by repeated inaction or dismissal of transgender inmates' concerns. In addition, the district court found that ODOC's process operates from a baseline of placement in men's facilities—a permissible inference stemming from ODOC's own data and ODOC's own description of its process. Defendants' answer is that ODOC assesses each prisoner individually. But an assessment is a way of arriving at a placement, not proof that the placement is safe. The mere existence of ODOC's purported assessment process does not, in practice, provide the protections its policy promises.

Second, the district court did not shift the burden of proof. It held that Plaintiffs bore the burden and had successfully carried it. Only after making that determination did the court then ask whether Defendants' evidence undermined Plaintiffs' showing. Crediting detailed firsthand accounts over summary

declarations from officials without personal knowledge of the events is ordinary factfinding, not burden shifting.

Third, the remaining *Winter* factors favor Plaintiffs. Rape, serious assault, retaliation, and self-harm cannot be undone by a later judgment, and a prisoner need not await another assault to obtain protection.

Fourth, the district court applied the correct standard. It required Plaintiffs to show that the law and facts clearly favored their position and found, in both its original order and on reconsideration, that they had. That the court discussed the Equal Protection claim under the ordinary standard does not disturb the independent Eighth Amendment ruling.

Fifth, the relief satisfies Rule 65 and the Prison Litigation Reform Act (PLRA). The order states why the relief was issued, describes what is required in reasonable detail, mandates no particular placement, preserves a documented security exception, and leaves implementation to ODOC. Requiring ODOC to apply protections Defendant claims are already in force is not micromanagement.

Finally, provisional certification was within the district court's discretion. The class challenges common practices and seeks a common remedy: a constitutionally adequate process, not a common destination. That the process will produce different placements for different women is part of the remedy, not a defect in the class.

Should the Court conclude that any discrete provision requires greater specificity, the remedy is targeted modification or remand, not vacatur of protections that do not depend on the disputed language.

## STANDARD OF REVIEW

This Court reviews the grant of a preliminary injunction for abuse of discretion. *BNSF Ry. Co. v. County of Alameda*, 7 F.4th 874, 878–79 (9th Cir. 2021) (citing *Puente Ariz. v. Arpaio*, 821 F.3d 1098, 1103 (9th Cir. 2016)). It reviews underlying legal conclusions de novo and factual findings for clear error. *Id.* (citing *Indep. Living Ctr. of S. Cal., Inc. v. Shewry*, 543 F.3d 1050, 1055 (9th Cir. 2008)). A finding is clearly erroneous only when it is illogical, implausible, or unsupported by permissible inferences from the record. *Arc of Cal. v. Douglas*, 757 F.3d 975, 983–84 (9th Cir. 2014) (quotation marks omitted).

Where the record permits two reasonable views of the evidence, the district court's choice between them is not clearly erroneous. *Anderson v. City of Bessemer City*, 470 U.S. 564, 573–74 (1985) ("If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. This is so even when the district court's findings do not rest on credibility determinations but are based on physical or documentary evidence or inferences from other facts."). In other words, this

Court may not reverse merely because it would have weighed the evidence differently. *Id.*

Plaintiffs agree that the amended injunction is mandatory. A party seeking mandatory preliminary relief must show that the law and facts clearly favor that party. *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc). The district court expressly applied that standard. 1-ER-18–19, 30; 1-ER-12. The heightened burden imposed on Plaintiffs in the district court does not change the appellate standard for review of factual findings.

The Court reviews provisional class certification for abuse of discretion, underlying legal questions de novo, and underlying factual findings for clear error. *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 663 (9th Cir. 2022) (en banc).

## ARGUMENT

### I. THE RECORD SUPPORTS THE FINDINGS THAT ODOC KNEW OF A SUBSTANTIAL RISK OF RAPE AND SERIOUS VIOLENCE AND DID NOT REASONABLY RESPOND.

#### A. Plaintiffs assert a right to reasonable safety, not a right to CCCF.

The Eighth Amendment requires prison officials to take reasonable measures to protect prisoners from violence by other prisoners. *Farmer v. Brennan*, 511 U.S. 825, 832–34, 837 (1994). A prison official acts with deliberate indifference when the official knows of and disregards an excessive risk to prisoner safety. *Id.* at 837.

Knowledge may be proved by circumstantial evidence, including evidence that the danger was obvious. *Id.* at 842.

Plaintiffs do not claim a constitutional right to CCCF or any other institution, and the court explicitly disclaimed such a right. *Olim v. Wakinekona*, 461 U.S. 238, 245–46 (1983); *see* 1-ER-44 ("There is no constitutional right to incarceration in a facility of an inmate's choice, and there is no liberty interest in an [inmate]'s housing preference."). CCCF is relevant because ODOC already uses it as one available placement. The amended injunction identifies CCCF only "as appropriate." 1-ER-3.

Defendants' reasons for denying a particular CCCF request therefore do not resolve the constitutional claim. The fact that CCCF may be unsuitable for a particular individual does not justify treating ordinary housing in a men's prison as the only alternative.

**B. The record supports the finding of a substantial risk of serious harm.**

Rape and serious physical assault are unquestionably serious harms under the Eighth Amendment. *Farmer*, 511 U.S. at 833–34. A prisoner need not wait to suffer another assault before obtaining prospective protection from an unreasonable danger. *Helling v. McKinney*, 509 U.S. 25, 33–35 (1993).
The record supported the district court's finding in several independent ways.

First, ODOC's own policy recognizes transgender status as relevant to vulnerability. Add-6–7. ODOC created TAIC to address the housing and safety needs of transgender, intersex, and nonbinary prisoners. 2-ER-238–40. That evidence confirms that the danger was neither unknown nor speculative.

Second, the district court considered national evidence describing the unusually high rate of sexual victimization among transgender prisoners. 1-ER-31. Defendants offered no competing evidence, statistical or otherwise, disputing that transgender prisoners face an elevated risk of sexual violence. In fact, counsel in this case, the Oregon Attorney General, Dan Rayfield, joined an amicus brief in a lawsuit in the D.C. Circuit, which cites the same evidence:

> the risk of sexual assault in prison for transgender individuals is much higher than non-transgender individuals. In the 2011–2012 National Inmate Survey, 37% of transgender incarcerated individuals reported being sexually victimized, compared to 3.4% of non-transgender individuals. In 2014, the Department of Justice's Bureau of Justice Statistics reported that, in a weighted average of three surveys between 2007 and 2012, approximately 34% of transgender individuals in correctional and detention facilities had been sexually victimized.

Br. of Amici Curiae States in Support of Plaintiffs-Appellees at 13–14, *Doe v. Trump*, No. 25-5099 (D.C. Cir. filed July 7, 2025), Doc. No. 2124152.

Third, the declarations provided by Plaintiffs showed that the danger had repeatedly materialized within ODOC. J.F. described rape, sexual coercion, an

assault that fractured her orbital socket, gang violence, and a suicide attempt associated with unsafe housing. 2-ER-303–07. Jane Doe described repeated rape and sexual assault by cellmates, physical attacks, ignored warnings, and retaliation. 2-ER-287–95. L.B. and S.S. described violence and the absence of reliable safe alternatives. 2-ER-296–302.

The court did not rely on generalized fears. It relied on specific incidents, housing assignments, and resulting injuries. 1-ER-20–35.

### C. ODOC's policies, its committee, and specific warnings establish actual knowledge.

Defendants argue that broad risk evidence does not prove that any ODOC official knew of an excessive risk to every class member. Opening Br. 14–22. That argument understates the record and the nature of prospective class relief.

ODOC's policies and specialized committee establish institutional awareness that transgender status can increase vulnerability. Add-6–7; 2-ER-238–40. The declarations added direct evidence of knowledge in particular cases. J.F. and a proposed cellmate both warned an officer that their assignment was unsafe before the cellmate raped her. 2-ER-303–07. J.F. repeatedly reported sexual harassment, threats, and unsafe placements. *Id.* Jane Doe repeatedly asked to leave dangerous cells and reported violence by her cellmates. 2-ER-287–95. L.B. reported that specific units were unsafe and was briefly moved by a PREA official for that reason. 2-ER-296–99.

The Eighth Amendment does not require proof that officials knew the precise time, place, and assailant of the next attack. *Farmer*, 511 U.S. at 842–43. Evidence that officials knew of an obvious and substantial danger, received specific warnings, and knew of prior victimization supports an inference of actual knowledge.

**D. The district court found that ODOC's response was inadequate.**

Officials do not violate the Eighth Amendment merely because an assault occurs despite a reasonable response. *Id*. at 844. The district court did not impose strict liability but examined what officials knew and what ODOC did in response.

The record described dangerous housing assignments that persisted despite repeated warnings, placement with prisoners known or reported to present sexual dangers, failures to provide timely protection after reports of threats or abuse, retaliation following the disclosure of those reports, and the use of segregation as the only alternative when ordinary housing became unsafe. 1-ER-20–30; 2-ER-287–307. The district court did not abuse its discretion by finding that these measures did not adequately address the known risk of serious harm transgender women are subjected to in ODOC custody..

Defendants' evidence concerning alleged formal PREA dispositions did not compel a contrary result. Sage stated that some allegations were substantiated, unsubstantiated, or unfounded. 2-ER-232–37. But her declaration did not address

several of the most serious incidents or provide enough information for the court to evaluate how the investigations were conducted and whether the resulting housing response was reasonable. 1-ER-8–9.

For example, Sage identified a substantiated incident in which another prisoner touched J.F.'s breast but did not address the assault that fractured J.F.'s orbital socket or the alleged rape after both cellmates warned staff that the assignment was unsafe. 1-ER-9. The district court did not clearly err by finding that the generalized investigative labels failed to answer the factual substance of those allegations. Defendants mistake "unsubstantiated" for a finding that "directly dispute[d]" the declarants' allegations. 2-ER-118. But an "unsubstantiated" allegation is not a finding that the allegation is false or even that it is likely false. It means only that the investigation did not produce sufficient evidence to make a final determination. *Id.* (citing 28 C.F.R. §115.5).

**E. Individual review is relevant, but not constitutionally sufficient.**

Defendants repeatedly invoke ODOC's individual assessments as though their existence defeats the Eighth Amendment claim. Opening Br. 14–18. It does not.

An individual assessment is one method by which officials may respond to a known danger. The relevant constitutional question remains whether the response was reasonable. *Farmer*, 511 U.S. at 837, 844. A committee can consider many

factors and still select a placement that fails to address a danger known to the institution.

The district court did not find that ODOC conducts no individual reviews. 1-ER-10. Rather, the court found that the process Defendants described had overwhelmingly resulted in placement in men's facilities and had failed to adequately address the safety risks reflected in the record. 1-ER-30–35.

That distinction answers Defendants' principal argument. The Eighth Amendment protects prisoners from deliberate indifference to serious danger. It does not merely protect them from the absence of paperwork, policies, or committee review.

### F. The amended injunction requires a constitutionally adequate review while preserving ODOC's discretion.

Defendants ask why, if individual assessment is insufficient, the district court ordered individual assessments. The answer is that the court did not reject individual assessment, but required a review directed at the constitutional danger it found.

The amended order changes the default but does not dictate the result. ODOC may depart from the starting presumption based on a documented and articulable security justification. 1-ER-3. Then, it must consider preference, privacy, medical care, programming, support networks, safety, and other individual circumstances. *Id.*

This structure requires ODOC to confront the safety risks of an existing placement rather than simply defaulting to it. In addition, the order leaves the final correctional judgment with ODOC. The court explained that the starting presumption "does not dictate an outcome for any individual [inmate]." 1-ER-14.

The order therefore respects both sides of the constitutional equation. ODOC retains authority to protect other prisoners and manage its institutions. Transgender women retain the right to a response that reasonably addresses a known risk of rape and serious physical violence.

## II. ODOC'S OWN DATA AND ITS OWN DESCRIPTION OF ITS PROCESS MADE THE BASELINE FINDING A PERMISSIBLE INFERENCE.

Defendants refer to the district court's baseline finding as the "foundational finding," and every argument in their brief proceeds from the premise that it was clearly erroneous. Their objection is that "no evidence" supports it. The record refutes that assertion, and disagreement with an inference the evidence permits does not establish clear error.

### A. Individual assessments and an operative baseline are not mutually exclusive.

Defendants equate the existence of individual review with the absence of a default. Opening Br. 14–18. But those concepts are not mutually exclusive. Defendants' arguments rest on another false assumption: even if ODOC conducts an individualized assessment before making a housing decision, that does not

establish that those assessments are free from a baseline presumption that transgender women should be housed in men's prisons. The fact that the district court did not accept Defendants' assumption is not "illogical." The district court's conclusions were supported by "inferences that may be drawn from the facts in the record," *Arc of Cal.*, 757 F.3d at 983–84, and were not clearly erroneous.

A system may consider individual factors while beginning from an existing placement that remains unchanged unless an official body affirmatively approves a transfer. That is how Defendants themselves described ODOC's process for most members of the class. A prisoner who identifies as transgender after entering custody "remain[s] in their current facility until [TAIC] reviews and makes a placement determination." 2-ER-240. Most known transgender women identified after their initial assignment to a men's facility. 2-ER-147–49.

For those prisoners, the process begins with continued placement in a men's facility. TAIC may change that placement after review, but the existing placement is the operative baseline. The district court's finding was therefore grounded in Defendants' own description of the process.

**B. ODOC's placement figures corroborated that baseline.**

Defendants do not explain why the district court's "foundational finding" is faulty. Defendants repeatedly contend that the district court's finding was "illogical" because there was "no evidence" to support it. Opening Br. 3, 6, 9, 13,

14, 18, 19, 22, 26, and 32. But ODOC's own data showed that approximately 94% of transgender women in its custody were housed in men's prisons. That nearly uniform systemwide outcome was itself affirmative evidence from which the district court could reasonably infer how ODOC's housing process operates. Defendants mistake the absence of conclusive proof for the absence of evidence. Defendants may dispute that inference or offer a different explanation for the data, but a disagreement over the weight and meaning of statistical evidence is not the absence of evidence.

This Court has repeatedly recognized that statistical outcomes may support factual inferences about an institution's regular practice, implicit policy, or standard operating procedure. Statistical outcomes are evidence from which a factfinder may infer how an institutional process operates. *United States v. Ironworkers Local 86*, 443 F.2d 544, 551–53 (9th Cir. 1971) (rejecting the characterization of statistical proof as an impermissible "numbers game"); *Diaz v. Am. Tel. & Tel. Co.*, 752 F.2d 1356, 1363–64 (9th Cir. 1985) (a pattern among individually made decisions may support an inference concerning an employer's "explicit or implicit policies"); *Obrey v. Johnson*, 400 F.3d 691, 694–96 (9th Cir. 2005) (statistical evidence may establish a "standard operating procedure"). And where competing reasonable inferences are available, the choice between them is

not clear error. *Anderson*, 470 U.S. at 573–74; *United States v. Hinkson*, , 1261–63 (9th Cir. 2009) (en banc).

Defendants' inference cases are inapposite. The district court did not infer a disputed fact from a complete absence of evidence. Nor did it rely on suspicion or guesswork. It relied on ODOC's description of its process, ODOC's placement data, and firsthand evidence showing how the resulting placements affected transgender women.

At most, Defendants attempt to identify another possible interpretation of the evidence. That is insufficient under clear error review. *Anderson*, 470 U.S. at 573–74 ("If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.").

Defendants argue that

> Although the record contained ample evidence of ODOC's individualized assessments for housing transgender women [inmates], and plaintiffs offered no evidence to the contrary, the district court inferred that those assessments must not be individualized—and that there is therefore a default presumption—because they result in most transgender women [inmates] being housed in men's prisons. For that inference to be valid, the court needed an evidentiary basis for why individualized determinations are unlikely to result in that outcome. But the court never identified such a basis. And in the absence of any evidence to support its inference, the

> court's factual finding is illogical and amounts to mere speculation.

Opening Br. 25. But this analysis is spurious; the court did not conclude at any time that the placement figures disproved that they emanated from individualized determinations. After all, all inmates are housed based upon individualized assessments. Those assessments universally place male inmates in men's prisons and female inmates at CCCF. Transgender women are almost universally housed in men's prisons amongst male inmates, with very rare exceptions. The statistical evidence is strong evidence that those housing outcomes are the product of baseline presumptions about where to house those groups. Baseline presumptions are compatible with individualized assessments and Defendants offer no reason to think otherwise.

Defendants suggest that the 115 transgender women housed in men's prisons are there because they cannot safely be housed at CCCF. Yet they offer no evidence for that proposition. The argument does exactly what they accuse the district court of doing, and it assumes that men's general population and CCCF are the only options.

**C. The court did not rely on the placement figures alone.**

The district court did not solely rely on the placement figures. Moreover, Defendants' own description of what would happen if the opposite presumption applied provided further support for the court's finding. In opposing preliminary

relief, Defendants argued that "'[p]resumptive placement' of transgender women [inmates] at CCCF or a designated transgender unit" would create safety and operational problems. 2-ER-265. The district court reasonably understood that argument as additional evidence that ODOC's existing system operates from a different starting point. 1-ER-37. As the court explained, Defendants themselves characterized a presumption favoring placement outside men's facilities as a material change to the existing system. *Id.* It was therefore reasonable to infer that the existing system begins from the opposite baseline. Defendants may disagree with that inference, but an inference drawn from their own description of how the proposed change would alter existing practice is neither speculative nor illogical.

The district court also addressed Defendants' reliance on individualized reasons for denying particular CCCF placements. It recognized that J.F.'s security history, for example, could be relevant to whether CCCF was an appropriate placement. But the court explained that such individualized reasons did not answer why J.F. necessarily had to remain in a men's prison, much less why placement in men's facilities was the prevailing outcome for transgender women generally. 1-ER-38. That distinction remains important on appeal. Evidence that ODOC sometimes makes individualized decisions, or has legitimate reasons not to place a particular person at CCCF, does not contradict the existence of a starting baseline. Nor does it explain the systemwide outcome reflected in ODOC's own data.

Defendants' arguments obscure the central issue. The question is whether housing transgender women in men's prisons—sharing cells, meals, work, and recreation with non-transgender men—is safe as a default. Defendants answer that they follow their policies; they do not defend the safety of the placements themselves. Framing the dispute as one about access to CCCF avoids the record showing that the current arrangement predictably results in women being raped, beaten, and humiliated, or living in fear of it.

### D. Failure to request CCCF is not an affirmative preference for existing housing.

Defendants point out that most transgender women had not formally requested CCCF. Opening Br. 18–22. The district court reasonably declined to treat that fact as proof that those prisoners preferred their existing placement.

A request for CCCF and an informed preference for ordinary housing in a men's facility are not opposites. A prisoner may prefer a safer unit within the same institution. She may fear disclosure or retaliation. She may be unaware of the request process. She may believe that CCCF is unsuitable but still consider her present cell or unit unsafe. She may prefer another protective arrangement.

ODOC's evidence concerning S.S. showed that ODOC can document an affirmative preference for a men's institution when one exists. 2-ER-242. Defendants did not provide comparable information showing that the remaining

population had made informed affirmative choices to remain in their current housing arrangements.

The amended order addresses this uncertainty by requiring ODOC to consider the prisoner's preferences and allowing her to voluntarily decline any protection after a meaningful review. 1-ER-3–4.

### E. Individual reasons for denying CCCF do not establish that the alternative was safe.

Defendants identify reasons why certain inmates did or did not receive CCCF placements. Opening Br. 16–18. Those examples show only that ODOC sometimes considers individual circumstances, which the district court never denied. 1-ER-10.

More importantly, Defendants repeatedly conflate two distinct questions: whether CCCF is an appropriate placement for a particular prisoner and whether the placement ODOC selected instead is constitutionally safe. A security reason to deny an inmate placement at CCCF may establish that CCCF is inappropriate for that individual. But it does not establish that housing her in a men's prison reasonably addresses the known risk of rape or serious physical violence.

### F. The Eighth Amendment inquiry does not turn on how ODOC characterizes its process.

The Eighth Amendment inquiry does not turn on why approximately 94% of transgender women in ODOC custody are housed in men's prisons. Whether that

result reflects a formal presumption, individualized assessments, or some other feature of ODOC's process is ultimately beside the point. The constitutional question is whether Defendants know that those placements expose transgender women to a substantial risk of serious harm and whether they have taken reasonable measures to abate that risk. *Farmer*, 511 U.S. at 837, 844–45. The district court found that they have not. Defendants cannot defeat that finding merely by characterizing the process that produced those placements as "individualized."

## III. THE DISTRICT COURT WEIGHED THE EVIDENCE; IT DID NOT SHIFT THE BURDEN OF PROOF.

### A. The district court never placed the burden on Defendants.

Defendants' burden-shifting argument cannot be reconciled with the orders. The reconsideration order begins by stating that Plaintiffs "met their burden to certify a class and met their burden to impose a mandatory preliminary injunction." 1-ER-6. It later states that the evidence led the court to conclude that the facts and law clearly favored Plaintiffs under the Eighth Amendment. 1-ER-12.

The original order made the same finding. 1-ER-30–35. The court did not presume Plaintiffs' allegations true or require Defendants to disprove them. It found that Plaintiffs had carried their affirmative burden.

### B. Plaintiffs presented evidence supporting each material finding.

Plaintiffs submitted firsthand declarations describing actual violence and specific warnings. 2-ER-287–307. They relied on ODOC's own policies recognizing vulnerability, ODOC's own placement data, and national evidence concerning the elevated risk of sexual victimization. Add-6–7; 1-ER-31; 2-ER-147–49, 238–43.

The district court did not use the absence of Defendants' evidence as a substitute for Plaintiffs' proof. It first evaluated Plaintiffs' affirmative showing. Only then did the court ask whether Defendants' response undermined that showing. That is not shifting the burden of proof.

### C. The court's discussion of evidence Defendants could have produced concerned weight, not burden.

Jones's declaration stated generally that some transgender women affirmatively prefer men's facilities. 2-ER-241. The district court observed that the declaration provided no numbers, examples, or nonidentifying circumstances supporting that assertion. 1-ER-9–10. It explained that anonymous declarations or nonidentifying information could have been submitted without disclosing anyone publicly. *Id.* And Jones never argued, let alone showed, that transgender women who affirmatively prefer men's facilities are statistically relevant to the default question or whether they are safe in their current institutions.

The district court's observation did not shift the burden. It explained why a generalized statement was less persuasive than detailed firsthand testimony. A factfinder may consider the specificity, foundation, and corroboration of competing evidence without changing who bears the ultimate burden.

The same applies to Defendants' PREA evidence. Sage's use of investigative labels did not require the court to treat those labels as conclusive, and the court could weigh the absence of underlying detail. 1-ER-8–9. As explained above, an "unsubstantiated" finding is not a determination that an allegation is false. 2-ER-118.

### D. Defendants' evidence was considered, but it did not compel their preferred result.

The district court considered Defendants' declarations. It found them less persuasive because they often described policy or summarized conclusions without providing any corroborating evidence or addressing the specific events and safety consequences described by the declarants. 1-ER-7–10; *see also* 1-ER-42 ("These conclusory claims are attested to by high-level ODOC staff with no personal or first-hand knowledge of the situations at issue. Defendants' evidence is insufficient to create a question of fact regarding whether Plaintiffs regularly experience violence and sexual assault by men in men's prisons. That assessment was within the court's factfinding role.").

## IV. EACH *WINTER* FACTOR FAVORS PLAINTIFFS.

Defendants' *Winter* argument is almost entirely derivative. They contend that every factor fails because the baseline finding was clearly erroneous. Opening Br. 23–25. That premise fails for the reasons stated above, and each factor independently supports the relief.

### A. Plaintiffs established a strong likelihood of success on their Eighth Amendment claim.

For the reasons explained in sections I through III, the record supported findings that transgender women face a substantial risk of rape and serious violence, that ODOC knew of the danger, and that its response was not reasonable. The district court held Plaintiffs to the heightened standard for mandatory relief and found that the facts and law clearly favored them. 1-ER-30–35.

### B. The threatened harms are irreparable.

The harms at issue are rape, serious physical assault, retaliation for reporting, and self-harm. 1-ER-20–30; 2-ER-287–307. No later judgment can remedy them. The district court found that Plaintiffs "suffer ongoing threats of violence and sexual assault . . . which have gone unheeded and unprevented by Defendants," and that Defendants' assurance that existing policies suffice lacked "any basis in reality for these inmates." 1-ER-39 (citing *Zombie v. State of Oregon,* No. 3:21-cv-01338-AA at *6 (D. Or. Sept. 8, 2023)). A prisoner need not await another assault before obtaining protection from an unreasonable danger. *Helling*,

509 U.S. at 33–35; 1-ER-39. Nor must every class member first be injured: the Eighth Amendment protects against exposure to a substantial risk of serious harm, and that exposure is itself the irreparable injury prospective relief exists to prevent. *Parsons v. Ryan*, 754 F.3d 657, 677 (9th Cir. 2014).

### C. The equities and public interest favor protection.

Because the government is the opposing party, the final two factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009); *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014); 1-ER-39.

The district court performed exactly the balancing Defendants say was owed by acknowledging the practical consequences of the ordered relief: staff training, logistical support, individual reassessments, and potentially a significant number of institutional transfers. 1-ER-40. It correctly weighed those considerations against the ongoing violence and sexual assault shown by the record and found that the institutional burdens were "significantly outweighed." *Id.* And the court observed that much of the relief requires only what PREA and ODOC's own policies already mandate, so that as to those provisions "ODOC must merely enforce and maintain the status quo." 1-ER-39–40. A burden that consists of conducting the reviews ODOC says it already conducts, and following the policies it says it already follows, carries little weight in the balance.

The safety of other prisoners, including the women housed at CCCF, weighs on the same side of the scale, not against the relief. The amended order builds that interest into its terms: ODOC may decline any placement on a documented and articulable security justification, and no provision requires a transfer ODOC determines to be unsafe. 1-ER-3. The court then went further, scheduling an evidentiary hearing "in an abundance of caution" to continue weighing the equities and any hardships on the prison system. 1-ER-40–41. That is the opposite of an unbalanced exercise of discretion.

The public interest points the same way. "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres I*, 695 F.3d at 1002 (quoted at 1-ER-40). Defendants have no legitimate interest in the continuation of a practice the district court found unconstitutional, and federal courts may not permit such a violation to continue merely because the remedy touches prison administration. *Porretti v. Dzurenda*, 11 F.4th 1037, 1047 (9th Cir. 2021) (quoting *Brown v. Plata*, 563 U.S. 493, 511 (2011)). 'Nor may federal courts "allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration."' *Id. (quoting Brown,* 563 U.S. at 511).

## V. THE DISTRICT COURT APPLIED THE HEIGHTENED STANDARD, AND ITS FINDINGS ARE REVIEWED ONLY FOR CLEAR ERROR.

### A. The orders expressly apply the heightened standard and find it satisfied.

Defendants begin from a premise refuted by the record. They contend that the district court applied only the ordinary likelihood-of-success standard. Opening Br. 12–14, 22–24. The district court expressly recognized that mandatory relief is subject to a higher standard. 1-ER-18–19. It then found that the facts and law clearly favored Plaintiffs on the Eighth Amendment claim. 1-ER-30–35.

After Defendants sought reconsideration, the district court had an additional opportunity to review the record and address their objections. Ultimately, the court adhered to its conclusion that relief was warranted, stating that Plaintiffs had "met their burden to impose a mandatory preliminary injunction." 1-ER-6. It later explained that the national risk evidence, detailed firsthand evidence, evidence of ODOC's awareness, and the weakness of Defendants' response led the court to conclude that the facts and law clearly favored Plaintiffs. 1-ER-12.

The court's separate discussion of the Equal Protection claim does not undermine the Eighth Amendment ruling. The court acknowledged that it had applied the ordinary likelihood standard to the Equal Protection claim, but it reaffirmed that the heightened mandatory injunction standard was satisfied

independently on the Eighth Amendment claim. *Id*. This Court may affirm without reaching Equal Protection.

### B. The mandatory nature of the injunction does not permit de novo reweighing of the record.

Defendants rely heavily on *San Luis Obispo Coastkeeper v. County of San Luis Obispo*, 161 F.4th 590 (9th Cir. 2025). That case does not permit de novo review of disputed facts. It confirms that preliminary injunction review remains limited and deferential and that findings are reviewed only for clear error. *Id.* at 596–97.

The defect the Court identified in *San Luis Obispo* was that while the district court identified significant competing evidence it did not weigh it or explain its effect on the required equitable analysis and deferred the balancing to a later agency decision. *Id.* In that case, under the Endangered Species Act (ESA), the Court was confronted by having to reconcile protecting one species potentially at the expense of another without sufficient evidence to do so. Here, there is no zero-sum, ESA problem. Rather, the district court did what *San Luis Obispo* requires: it evaluated Plaintiffs' declarations, ODOC's policies, the declarations from ODOC officials, the placement figures, and the parties' competing interpretations. 1-ER-30–40. On reconsideration, it addressed Sage and Jones's declarations individually and explained why they did not outweigh Plaintiffs' detailed testimony. 1-ER-7–10. That was reasonable and not an abuse of discretion.

Defendants now ask this Court to assign more weight to written policy and high-level declarations, less weight to firsthand testimony, and a different meaning to the placement data. Opening Br. 13–22. That is quintessentially a request to reweigh evidence.

## VI. THE AMENDED INJUNCTION STATES ITS TERMS SPECIFICALLY AND SATISFIES RULE 65.

### A. Rule 65 requires reasonable detail, not a line-by-line operating manual.

The district court's preliminary injunction complies with Rule 65. Rule 65(d)(1) provides that "[e]very order granting an injunction and every restraining order must: (A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail … the act or acts restrained or required." The Rule "was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood." *Melendres v. Skinner*, 113 F.4th 1126, 1139 (9th Cir. 2024) ("*Melendres V*"). But a district court has "considerable discretion in fashioning suitable relief," and appellate review of an injunction's terms "is correspondingly narrow." *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991) (quoting *Coca-Cola Co. v. Overland, Inc.*, 692 F.2d 1250, 1256 n.16 (9th Cir. 1982)). This Court reviews the scope and terms of an injunction for abuse of discretion, which occurs only if the court applies incorrect

law or rests its decision on a clearly erroneous finding of material fact. *Melendres V*, 113 F.4th at 1132; *Bateman v. U.S. Postal Serv.*, 231 F.3d 1220, 1223 (9th Cir. 2000).

Here, the district court stated clearly the reasons why it issued a preliminary injunction: that Plaintiffs "had shown that the facts and law favored their position that a default presumption of housing in men's facilities, and a failure to provide other protections and investigations into violence by male [inmate]s, had created a risk of serious injury in violation of the Eighth Amendment." The district court in its amended order set forth the terms of the injunction. 1-ER-3–4. The district court described

> in reasonable detail how the Defendants should continue providing individualized assessments, while also beginning those assessments from a different default position as to placement, and requiring Defendants to provide other assurances of safety for the [inmate]s who remain in the men's facilities, such as the shower access, strip-search requirements, reporting mechanisms and good faith investigations for PREA incidents, and [inmate] mental health resources.

1-ER-13.

The district court did not provide a "line-by-line operating manual" but instead chose to leave the "logistical details open to allow ODOC the flexibility to implement the[] orders in ways that will be safe and effective for inmates and staff." *Id.*

Defendants' arguments that these orders are "vague and overbroad" are overstated. The order's terms here "can hardly be said [to be] 'too vague to be understood.'" *Melendres V*, 113 F.4th at 1140 (citing *Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1087 (9th Cir. 2004), quoting *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974)). This Court has repeatedly held that court orders will not be set aside under Rule 65 "unless they are so vague that they have no reasonably specific meaning." *A&M Records, Inc. v. Napster, Inc.*, 284 F.3d 1091, 1097 (9th Cir. 2002) (quoting *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1297 (9th Cir. 1992)); *see Fortyune*, 364 F.3d at 1087 (citing *United States v. V–1 Oil Co.*, 63 F.3d 909, 913 (9th Cir. 1995)). Defendants have simply not shown that the district court's orders are so vague that they have "no reasonably specific meaning."

The terms cited by Defendants, "reasonable bodily privacy," "extraordinary, documented circumstances," and "serious physical violence," are not so vague as to have no reasonably specific meaning. Indeed, these are terms Defendants use in their own PREA policies cited in their brief: "*reasonable* suspicion," "*reasonable* belief," "informed," "*reasonable* communication" "*serious* consideration," etc. Defendants' policies are replete with phrases like "extent possible," "bad faith," "extended delay," "promptly document," "limited circumstances," "access to

necessary services," etc., which Defendants rely upon in making the decisions that are the subject of the district court's relief.

Defendants' reliance on *Dickinson v. Trump*, 174 F.4th 634 (9th Cir. 2026) is misplaced. Opening Br. 28. First, *Dickinson* did not hold that '"reasonably necessary," "active resistance," and "legally justified" are impermissibly vague terms for an injunction.' *Id.* (citing *Dickinson*, 174 F.4th at 650). Additionally, the State of Oregon also filed an amicus in *Dickinson* supporting the injunction and an Oregon State Police Captain testified as an expert in the case that the terms were safe and workable for law enforcement. *Dickinson* was a stay decision and did not analyze the injunction under Rule 65; its conclusion in no way held that such terms are impermissibly vague for all injunctions.

The stay panel in *Dickinson* based its decision on generalized impacts an injunction may have on "law-enforcement activities responding to safety risks" because that context "inevitably involve[s] 'split-second judgments." *Id.* at 650. The burden that potentially vague injunction terms may place on an officer's decision-making during a protest is inapplicable to what the amended order governs here. The amended order here governs deliberative administrative decisions. TAIC has access to records, histories, medical and mental health information, PREA classifications, and the prisoner's own views. ODOC can

document its reasoning and conduct periodic reviews. The order does not regulate any split-second judgments.

### B. The operative amended order, not the superseded language, defines Defendants' obligations.

Defendants' vagueness and breadth arguments frequently rely on language from the original order. Opening Br. 25–31. The amended order superseded that relief. 1-ER-2.

The operative order makes clear that the gender identity presumption is only a starting point. 1-ER-2–3. The district court's order identifies a documented security exception and lists the individual considerations that follow. *Id.* at 3. CCCF is recognized as one possible placement, not the required destination. *Id.* It also permits as an alternative to CCCF, voluntary transgender or gender non-conforming housing units within existing facilities, or other protective placements that do not involve involuntary segregation or loss of programming solely because of transgender status. *Id.* Prisoners may also voluntarily decline those protections. 1-ER-4. The district court's order does not require housing transgender women at CCCF. The reconsideration decision further explains that the order does not dictate any individual outcome. 1-ER-14. The amended order must be read in that context.

### C. The housing provisions are tied directly to the dangers found by the court.

Paragraphs 1 through 3 address housing review, safe alternatives, and cellmates known to have histories of sexual or serious physical violence. *Id*. Each corresponds directly to evidence credited by the district court.

The record showed that ordinary housing with male prisoners, including particular units and cells, exposed the declarants to a risk of sexual and physical violence. 1-ER-20–30. It also showed that segregation often operated as the only alternative when those placements became unsafe. *Id.* The district court therefore required safe, nonpunitive options.

The order does not require ODOC to create a particular transgender unit, though it is one of the possible protective measures contemplated by the orders. Paragraph 2 lists examples and allows "other protective placements." 1-ER-3. ODOC may use CCCF where appropriate, designate a voluntary unit within an existing institution, use a safer existing unit or complex, or develop another protective arrangement. The order leaves that choice to correctional officials.

Defendants repeat their contention that "PREA standards advise against transgender-only units" and cite to Sage's declaration for this proposition. Opening Br. 28–29; 2-ER-236. But that misstates the PREA standards; 28 C.F.R. § 115.42(g) is the pertinent provision which provides that

> The agency shall not place … transgender … inmates in dedicated facilities, units, or wings solely on the basis of such identification or status, unless such placement is in a dedicated facility, unit, or wing established in connection with a consent decree, legal settlement, or legal judgment for the purpose of protecting such inmates.

This provision "excepts situations [like here] where such placement is pursuant to a court order." *Monroe v. Bowman*, No. 3:18-CV-00156-NJR, 2025 WL 3267798, at *6 (S.D. Ill. Nov. 24, 2025).

Paragraph 3 is also concrete. ODOC must not place a transgender woman with a cellmate known to have a history of sexual or serious physical violence. *Id*. ODOC has criminal, disciplinary, PREA, and classification records relevant to that determination. Defendants' position here is that they already consider this type of information when ODOC makes classification decisions and seek to separate vulnerable prisoners from likely aggressors. 2-ER-235. If that assertion is correct, paragraph 3 requires adherence to an existing safety principle.

### D. The privacy and search provisions respond to specific record evidence.

Paragraph 4 requires separate shower arrangements or schedules and reasonable privacy from male prisoners and staff. 1-ER-3. PREA already requires that transgender prisoners have an opportunity to shower separately. 28 C.F.R. § 115.42(f); Add-4. ODOC also represented that it provides private showers or separate shower times. 2-ER-234–35. The order therefore states a familiar

requirement directed at evidence that the declarants were exposed while showering, changing, or using the toilet. 1-ER-20–30.

Paragraph 5 requires female staff for unclothed searches unless extraordinary, documented circumstances exist. 1-ER-4. The record described repeated male staff searches that aggravated trauma and humiliation. 1-ER-25, 32. The exception preserves ODOC's ability to respond when staffing or emergency conditions make the ordinary rule impracticable. The documentation requirement makes the exception reviewable.

The Ninth Circuit has long recognized that cross gender searches can cause serious psychological harm in a prison setting, depending on the circumstances and the prisoners' histories. *Jordan v. Gardner*, 986 F.2d 1521, 1525–31 (9th Cir. 1993) (en banc). The district court did not invent an unrelated requirement. It responded to specific evidence of harm.

### E. The reporting, retaliation, and mental health provisions are also tied to the record.

Paragraph 6 requires confidential and nonretaliatory reporting, effective hotline access, good faith investigations, and protection against retaliation. 1-ER-4. The declarations described reports disclosed to alleged perpetrators, delayed or ineffective investigations, ignored hotline complaints, and retaliation after reporting. 1-ER-20–30; 2-ER-287–307.

ODOC maintains that it already has confidential reporting mechanisms, a hotline, trained investigators, and a zero-tolerance policy concerning retaliation. 2-ER-234–36. The injunction does not impose a foreign system. It requires the existing mechanisms to operate effectively and without retaliation.

Paragraph 7 requires interim crisis support when a transgender woman reports sexual abuse or exhibits suicidality connected to unsafe housing or retaliation. 1-ER-4. That provision responds directly to evidence of suicide attempts, self-harm, and severe psychological destabilization. 1-ER-22, 24.

Paragraph 8 addresses Defendants' concern about differing preferences. A prisoner may decline protections after an informed and voluntary review. 1-ER-4. No person is forced to transfer, enter specialized housing, or abandon a placement she considers safe.

The district court's injunction satisfies Rule 65. If this Court nevertheless concludes that any discrete provision lacks the specificity Rule 65 requires, the appropriate remedy is targeted modification or remand for clarification, not vacating the entire injunction.

## VII. THE RELIEF IS NARROWLY DRAWN AND NO MORE INTRUSIVE THAN THE PLRA ALLOWS.

### A. The district court applied the correct standard and tied the relief to the harm it found.

The PLRA does not impose a different or stricter test at the preliminary injunction stage. Preliminary relief in a prison conditions case must be narrowly drawn, extend no further than necessary, and use the least intrusive means. The needs-narrowness-intrusiveness analysis is measured by reference to "the harm the court finds requires preliminary relief[.]" 18 U.S.C. § 3626(a)(2). The court must also give substantial weight to any adverse impact on public safety or the operation of the criminal justice system. *Id.* § 3626(a)(2). Beyond that, the statute "merely codifies existing law and does not change the standards for determining whether to grant an injunction." *Porretti*, 11 F.4th at 1051 (quoting *Gomez v. Vernon*, 255 F.3d 1118, 1129 (9th Cir. 2001)); *see Armstrong v. Newsom*, 58 F.4th 1283, 1291–94 (9th Cir. 2023).

The district court addressed those requirements at length. 1-ER-41–47. It first found that Defendants had not substantively contested the factual record supporting relief. Plaintiffs had filed "detailed, first-hand factual allegations of unaddressed violence and sexual assault, attested to by sworn declarations," while Defendants' declarations "fail[ed] to dispute Plaintiffs' allegations with anything other than broad, conclusory claims that such allegations are 'unsubstantiated.'" 1-

ER-42. Those claims came from "high-level ODOC staff with no personal or first-hand knowledge of the situations at issue." *Id*. The court therefore found that Plaintiffs had shown, and Defendants had not meaningfully disputed, that transgender women "regularly experience violence and sexual assault by men in men's prisons." *Id*.

The court then explained why the relief was narrowly drawn. It found the relief "narrowly tailored and least-intrusive because it maintains the current process of individualized safety assessments and case-by-case housing and classification reviews, which means that no specific outcome is mandated in any particular [inmate]'s case." 1-ER-43. Where Defendants responded that ODOC already provides private showers, confidential PREA reporting, same-gender searches, and mental health support, the court answered that "[t]o the extent that the policies are not being appropriately applied, as evidenced in the record in this case, ODOC must bring itself into compliance." 1-ER-47. It concluded that the relief "is necessary, least-intrusive, and narrowly tailored to address the constitutional violations at issue." *Id*.

The court also gave substantial weight to the safety consequences Defendants raised. The order permits ODOC to depart from placement consistent with gender identity where there is "a documented and articulable security justification," which preserves ODOC's authority to protect the women housed at

CCCF and to manage its institutions. 1-ER-3. It requires no transfer that ODOC determines to be unsafe, and it permits a prisoner to decline any protection offered. 1-ER-3–4.

### B. The decisions Defendants cite rejected the micromanagement objection they now raise.

Defendants do not engage the district court's needs-narrowness-intrusiveness analysis. Instead, they assert that the district court is "micromanaging the state's administration of its prison system" and has ordered relief requiring "the continuous supervision by the federal court over the conduct of state officers." Opening Br. 30–31. They do not explain how any particular provision of the amended order has that effect.

Their own authorities answer the argument. In *Armstrong v. Brown*, this Court said that a district court "may provide guidance and set clear objectives, but it may not attempt to 'micro manage' prison administration," or order relief requiring "the continuous supervision by the federal court over the conduct of state officers." 768 F.3d 975, 983 (9th Cir. 2014). It then affirmed detailed structural relief over that very objection, vacating only provisions that delegated adjudicative authority to a court-appointed expert. *Id*. In *Porretti*, prison officials likewise contended that the district court had "impermissibly micromanaged" the case. 11 F.4th at 1051. This Court disagreed, observing that officials who had "failed to follow court orders" then "unpersuasively characterize the district court as a

micromanager because it enforced its orders," and it affirmed the injunction as neither overbroad nor unduly intrusive under § 3626(a)(2). *Id.* at 1051–52. *Bell v. Wolfish* is not to the contrary. The passage Defendants rely on concerns the scope of judicial inquiry into whether a prison system violates the Constitution and reserves to officials the "'judgment calls' that meet constitutional and statutory requirements." 441 U.S. 520, 562 (1979). The finding does not limit a court's remedial authority once a violation has been shown.

Federal courts "must not shrink from their obligation to enforce the constitutional rights of all persons, including prisoners," and may not "allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration." *Porretti*, 11 F.4th at 1047 (quoting *Plata*, 563 U.S. at 511). Deference to prison expertise is genuine, but it is not abdication.

The amended order identifies constitutional objectives and leaves ODOC to select the operational means. 1-ER-13. It appoints no monitor, requires no reports to the court, and conditions no individual placement on judicial approval. That is precisely what the PLRA permits: guidance and clear objectives. Any concern with a discrete term supports targeted clarification, not vacating the entire order.

The amended injunction contains distinct protections directed at distinct harms. A concern with the starting presumption in paragraph 1 would not

undermine the evidence supporting protection from cellmates known to have committed sexual or serious physical violence, bodily privacy while showering and changing, same-gender unclothed searches, confidential and nonretaliatory reporting, or crisis mental health care.

If this Court concludes that a particular provision requires greater specificity or further justification, it should remand for clarification while preserving the remainder of the relief. That is how this Court proceeded in *Armstrong v. Newsom*, reviewing each remedial provision separately and vacating only those the record did not support. 58 F.4th at 1291–94. Vacating the entire order would expose the class to the very dangers the district court found while eliminating provisions that do not depend on the disputed wording.

## VIII. PROVISIONAL CERTIFICATION WAS PROPER BECAUSE THE CLASS CHALLENGES A COMMON PRACTICE AND SEEKS A COMMON PROCESS.

Defendants' arguments against class certification are largely dependent on its arguments above. They argue that the district court's provisional class certification '"depended on, and was in service of,' an infirm preliminary injunction," and therefore '"the class certification order necessarily [should] fall[] as well, regardless of whether class certification was otherwise proper under Federal Rule of Civil Procedure 23."' Opening Br. 37 (quoting *Fraihat v. U.S. Immigr. & Customs Enf't*, 16 F.4th 613, 635 (9th Cir. 2021)).

But Defendants do not explain how this case is analogous to *Fraihat* other than that both cases involve provisional class certifications and preliminary injunctions. While the provisional class certification in this case could be characterized as being entered in service of the preliminary injunction, it is not dependent on it. The court could have provisionally certified the class even if no preliminary relief had been entered, and apart from a commonality argument, *infra*, defendants do not challenge the district court's findings regarding provisional class certification. That is not sufficient.

Defendants next argue that provisionally certifying a class was an abuse of discretion, relying on the same arguments they made concerning the injunction, namely that "ODOC has a default presumption for housing transgender women [inmates] in men's prisons." Opening Br. 39. This is derivative of the arguments made above and fails for the same reasons.

The only frontal attack on the district court's decision to provisionally certify the class is that a "class is not proper" because the "needs [of the class members] are highly individualized" and therefore "no single remedy is likely to meet the needs of every transgender [inmate]." This is essentially a commonality argument. Commonality requires a common contention capable of classwide resolution. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). The question

here is whether ODOC's housing and safety practices expose transgender women to a substantial risk of serious harm without a constitutionally reasonable response.

That question concerns ODOC's policies, TAIC process, placement baseline, use of vulnerability information, available housing alternatives, cell assignment practices, privacy protections, reporting systems, and response to known dangers. Those matters can be evaluated through common evidence. *Parsons* is directly instructive. 754 F.3d at 657. There, prisoners challenged statewide policies and practices that allegedly exposed them to a substantial risk of serious harm. The class members had different conditions, needs, and eventual injuries. This Court held that those differences did not defeat commonality because the class challenged common practices and exposure to a common substantial risk. *Id.* at 676–81.

The same reasoning applies here. Not every transgender woman has been assaulted. Not every member wants the same facility. Those differences do not alter the common question concerning the constitutional adequacy of ODOC's safety process.

Defendants argue that housing depends on individual medical, security, programming, privacy, and preference considerations. Opening Br. 31–34. Plaintiffs agree. That is why the injunction requires individual decisions.

The common remedy is not placement at a common destination. It is a constitutionally adequate review governed by common safety requirements. ODOC may reach a different final decision for every class member. Rule 23 does not require identical outcomes where a single injunction can correct the common process. The district court relied on *Rosas v. Baca*, No. CV-12-00428-DDP-SHX, 2012 WL 2061694, at *3 (C.D. Cal. June 7, 2012), holding that "in a civil rights suit, 'commonality is satisfied where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members.… Under such circumstances, individual factual differences among class members pose no obstacle to commonality.'" 1-ER-49 (citations and quotation marks omitted). *Roman v. Wolf*, 977 F.3d 935, 944–45 (9th Cir. 2020), likewise recognizes that provisional class relief may address a common institutional risk even though individual circumstances affect how the relief applies.

Because the preliminary injunction is supported and the Rule 23 findings were within the district court's discretion, the provisional certification should be affirmed.

## CONCLUSION

The Court should affirm the amended preliminary injunction and the provisional class certification.

Alternatively, if the Court concludes that some part of the injunction requires greater specificity or narrower tailoring, it should affirm the district court's determination that temporary Eighth Amendment relief is warranted and remand for modification. It should not vacate the remaining protections or the provisional certification.

Dated: August 20, 2026

Respectfully submitted,

*/s/ John Burgess*

Carl Post, OSB No. 061058
carlpost@civilrightsoregon.com
John Burgess, OSB No. 106498
johnburgess@civilrightsoregon.com

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7), Federal Rules of Appellate Procedure, I certify that the Answering Brief is proportionately spaced, has a typeface of 14 points or more and contains 12,464 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

Dated: August 20, 2026

**POST BURGESS**

*/s/ John Burgess*
Carl Post, OSB No. 061058
carlpost@civilrightsoregon.com
John Burgess, OSB No. 106498
johnburgess@civilrightsoregon.com
Tel: (971) 442-9303

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, counsel for Plaintiff-Appellant states that they are not aware of any related case pending in this Court.

## CERTIFICATE OF SERVICE

I hereby certify that on August 20, 2026, I directed the Appellees' Answering Brief to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: August 20, 2026

**POST BURGESS**

*/s/ John Burgess*
Carl Post, OSB No. 061058
carlpost@civilrightsoregon.com
John Burgess, OSB No. 106498
johnburgess@civilrightsoregon.com
Tel: (971) 442-9303